# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30047

UNITED STATES OF AMERICA,

  Plaintiff - Appellee

v.

KIM RICARD,

  Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
April 26, 2019

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, DENNIS, and HIGGINSON, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Kim Ricard was convicted by a jury of one count of conspiracy to pay and receive kickbacks for referring Medicare patients to a particular health care provider, three counts of receiving such kickbacks for such referrals, three counts of identity theft, and one count of making false statements to a federal agent. The district court sentenced Ricard to a fifty-one-month term of imprisonment as to each count, to be served concurrently, and ordered her to pay $1,958,000 in restitution to Medicare. On appeal, Ricard challenges her convictions and her sentence. We affirm Ricard's convictions but vacate her sentence, reverse and vacate the restitution order, and remand for resentencing and dismissal of the restitution order.

No. 18-30047

I.

Kim Ricard was hired by Progressive Home Care in 2008. Progressive was a home health agency owned by Milton Diaz that primarily served Medicare patients. As a home health agency, Progressive provided nursing services to homebound patients who require continuing care after being discharged from a hospital. Medicare provides coverage for home health care when a physician certifies home care is necessary. Patients must then be given a list of home health agencies to choose from. Medicare requires that the patient, not the doctor, choose the home health agency. Once patients choose a particular agency to provide the home care services, they are discharged and receive such home health care for sixty days. That home health agency may recertify the patient for additional sixty-day treatment periods until home health care is no longer required. To bill for treatment, a home health agency provides Medicare with the patient's information, including a Medicare Health Insurance Claim Number ("HIC number"), which is a unique number identifying the patient.

Ricard's role at Progressive was to recruit and refer Medicare patients to Progressive for home care psychiatric treatment. Instead of a traditional salary, Diaz paid Ricard $250 on each occasion that she referred a patient. He later increased that amount to $300 per patient after Ricard requested more money. Unlike other employees at Progressive, Ricard's checks were always in round dollar amounts. The memo line on Ricard's checks often referenced the number of new admissions or recertifications for which Ricard was being paid.[1] She was the highest paid employee at Progressive from 2008 through 2013, earning $331,389 during that period.

---

[1] As examples, Ricard's check dated October 11, 2010, was for $4,500 and the memo line read "5 ADMITS, 13 RECERTS." A second check, dated October 25, 2010, was for $4,200

2

No. 18-30047

All of Ricard's referrals to Progressive for home care came from the outpatient psychiatric program provided at Seaside Behavioral Center. It is not incidental that Ricard was in a romantic relationship with Joe Haynes, an administrative person at Seaside. Haynes instructed two psychiatrists employed by Seaside to refer patients to Progressive. Ricard and Haynes demanded that Diaz also pay Seaside's psychiatrists in exchange for such referrals.

Ricard and Haynes told Diaz that if he stopped paying Ricard per patient referral she would stop referring Progressive patients and move Seaside's patients, whom she had previously referred, to another home health provider. Haynes also threatened to transfer Seaside's patients to other home health agencies if Ricard was not paid more per referral. On March 8, 2013, a Seaside psychiatrist ordered Progressive to "mass discharge all of her patients." According to a Progressive employee, "money issues" between Ricard and Diaz caused Ricard to stop referring patients to Progressive; none of the referred patients had complained to Progressive or asked to be discharged from Progressive's care. On March 12, 2013, Haynes called Progressive three times demanding money owed to Ricard. Haynes and Ricard also called patients they had referred to Progressive and told them to refuse treatment from Progressive or else they would be kicked out of Seaside's day program. Most of these patients ultimately refused treatment from Progressive and were accordingly discharged from Progressive's care.

In late 2013, after leaving Progressive, Ricard was hired by Abide Home Services, another home health agency. When Ricard first met with Abide's owner, Lisa Crinel, she asked to be paid per patient referral. Crinel told Ricard

---

and the memo line read 14@300. A third, dated November 8, 2010, was for $5,700 with a memo line reading "16 recerts@300, 3 admits."

that Abide did not pay by referral; instead she would receive an annual salary of $50,000 plus a bonus if she referred over six patients per month. According to Crinel, Ricard was "a little shocked" by this payment structure and told Crinel that she was used to being paid up to $1,000 per patient. As at Progressive, the only work Ricard did at Abide was soliciting and referring patients. Unlike other marketers employed by Abide, Ricard did not attend orientation or weekly marketing meetings. She also did not go out into the field to market for Abide. Crinel and Ricard would exchange text messages about patient referrals. In one text message, Ricard wrote "I'm sending five face sheets. Let me know if their numbers are good." Crinel testified that "numbers" referred to patient's HIC numbers. A number was "good" if the patient was not connected to another home health agency, allowing Abide to bill Medicare for that patient.

As when Ricard was with Progressive, all the patients she referred to Abide were from Seaside. Haynes, still at Seaside, continued his practice of calling Ricard's employer to complain, "in a very stern manner," that Ricard should receive more money for referring patients. During Haynes's last phone call with Abide, he yelled and swore at Crinel and threatened to tear up admitting forms that Abide used to bill Medicare because Ricard's paycheck was less than he expected. Ricard ultimately transferred her recruited patients away from Abide.

In 2014, the Office of the Inspector General of the United States Department of Health and Human Services (OIG–HHS) received a tip from Progressive's bank that Progressive was paying Ricard kickbacks. Special Agent Brian Reel reviewed Ricard's checks and, based on the round number amounts and reference to the number of "admits" and "recerts" in the checks' memo lines, believed Ricard was being paid kickbacks. Agent Reel proceeded to interview Diaz in May 2015. According to Agent Reel, Diaz became visibly

nervous when asked about Ricard. Agent Reel also found red flags when examining Medicare data for Progressive. For instance, he discovered that Progressive and Seaside shared nearly fifty patient-beneficiaries, even though Progressive's homebound patients should have been unable to travel to Seaside for outpatient treatment. Additionally, he found it significant that twenty patients referred from Seaside were discharged in February and March 2013. All twenty of those patients were referred by the two Seaside psychiatrists who were receiving kickbacks from Progressive.[2] Agent Reel also obtained a certification from the IRS that Ricard had failed to file federal income tax returns between 2008 and 2014. And Agent Reel discovered that Ricard had lied in a credit application, reporting her monthly income as $3,500 when, at the time, she was earning approximately $8,000 per month.

Accompanied by Special Agent Artie DeLaneuville, Agent Reel arranged a meeting with Ricard at a coffee shop on July 29, 2015. The interview was not recorded or transcribed. Instead, Agent Reel memorialized the interview in a written report. It is unclear when the report was prepared.[3] The report was not admitted into evidence. According to Agent Reel's testimony, he asked Ricard twice whether she was paid per patient referral at Progressive and she denied it each time, saying "there's no way she was paid per patient referral at Progressive." Upon being asked about referral payments, Ricard became

---

[2] Agent Reel corroborated that the psychiatrists were being paid by Progressive through bank records.

[3] The report was dated January 7, 2015—six months before the interview. Both parties agree that this was the result of a typographical error. Ricard suggests that the typographical error in the report was in the year, meaning it was prepared January 7, 2016, six months after the interview. The government does not indicate when it believes the report was prepared. Agent Reel testified that he prepared the report "[s]hortly after the interview," and he was "sure I meant 8" regarding the error. Assuming "8" referred to the number representing the month, not the day or part of the year, the report would have been prepared August 7, 2015, approximately one week after the interview.

"nervous, agitated and jumpy."  After her second denial, Agent Reel showed Ricard checks written to her by Progressive and drew her attention to the memo lines referencing referrals, admissions, or recertifications.  After looking at the checks, Ricard told Agent Reel that she "had no idea about kickbacks and referrals at Progressive" and that she could not recall the financial agreement that she had with Diaz.  She then asked Agent Reel how much he thought she was paid per referral.  He responded $250 per referral.  Agent DeLaneuville then asked Ricard whether she was paid $250 per referral by Progressive.  She did not respond.

## II.

Ricard was indicted on one count of conspiracy to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 (Count One); three counts of receiving health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) (Counts Two–Four); three counts of unlawful possession, transfer, or use of a means of identification, in violation of 18 U.S.C. § 1028(a)(7) (Counts Eight–Ten); and one count of making false statements, in violation of 18 U.S.C. § 1001 (Count Eleven).

Ricard's indictment for conspiracy, kickbacks, and identity theft stemmed from her involvement with the alleged kickback scheme at Progressive.  She was not charged with any acts relating to her work at Abide. Prior to trial, the government notified Ricard that it intended to introduce evidence that Ricard received kickbacks at Abide, arguing that it was intrinsic to the charged crimes or, alternatively, admissible pursuant to Federal Rule of Evidence 404(b).[4]  Ricard objected and moved to prohibit its use.  The district

---

[4] Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but "may be admissible for another purpose, such as

court, however, overruled Ricard's objection and held the evidence admissible under Rule 404(b). At the close of trial, Ricard moved, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal, arguing that the evidence against her was insufficient. The district court denied the motion. As part of its charge, the jury was given a deliberate ignorance instruction over Ricard's objection. The jury convicted Ricard on all eight counts.

Prior to her sentencing, the United States Probation Office (USPO) prepared an initial Presentence Report (PSR). The initial PSR found Ricard's base offense level, pursuant to United States Sentencing Guidelines (U.S.S.G.) § 2B4.1(a), to be eight. The initial PSR also recommended a ten-level enhancement, pursuant to U.S.S.G. § 2B1.4(b)(1)(B), because the kickbacks totaled $249,300. Based on her total offense level of eighteen and her criminal history category of I, her advisory guideline imprisonment range was twenty-seven to thirty-three months. The government objected to the initial PSR's calculation of the kickback amount, noting that the evidence at trial indicated the actual amount of kickbacks Ricard received was $331,000. Furthermore, the government argued that the improper benefit conferred, calculated as the total amount of payments Progressive received from Medicare, should be used instead because it exceeded the amount paid in kickbacks. According to the government, that amount was $1.98 million. The USPO issued a final PSR adopting the government's arguments and concluding that $1.958 million was the improper benefit conferred. This calculation resulted in a sixteen-level enhancement. Her revised total offense level of twenty-four produced an advisory guideline imprisonment range of fifty-one to sixty-three months.

---

proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2).

No. 18-30047

The initial PSR also recommended that Ricard make $249,000 in restitution to Medicare. The government similarly objected to the victim impact calculation, arguing that it should also be $1.98 million. The USPO agreed with the government's reasoning and, in its final PSR, recommended that Ricard make $1.958 million in restitution to Medicare.

The district court overruled Ricard's objections to the final PSR and adopted its recommended finding of facts. The court then sentenced Ricard to a fifty-one-month term of imprisonment as to each count, to be served concurrently, and ordered her to pay $1.958 million in restitution to Medicare, jointly and severally with her co-defendant Diaz

Ricard has timely appealed. She challenges the sufficiency of the evidence as to each count, the district court's evidentiary ruling admitting evidence of the similar scheme at Abide, inclusion of a deliberate ignorance jury instruction, the calculation of her advisory guideline range, and the amount of her restitution order. We consider each challenge in turn.

III.

A.

We first address Ricard's challenges to the sufficiency of the evidence. In doing so, we consider Counts One–Four together. That is, Ricard's convictions for one count of conspiracy to receive and pay kickbacks and three counts of receiving kickbacks for referring Medicare patients. *See* 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1)(A).

Ricard preserved her challenge to the sufficiency of the evidence as to Counts One–Four and therefore our review is de novo. *See United States v. Eghobor*, 812 F.3d 352, 361–62 (5th Cir. 2015). We may only reverse her conviction if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Ford*, 558 F.3d 371, 375 (5th Cir.

No. 18-30047

2009)). We must "view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *Id.* (quoting *Ford*, 558 F.3d at 375).

The Medicare kickback statute "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program."[5] *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). To obtain a conviction under the statute for receiving kickbacks, the government must prove beyond a reasonable doubt that the defendant (1) solicited or received renumeration, (2) in return for referring an individual for a service, (3) that may be paid under a federal health care program, and (4) that the defendant acted knowingly and willfully.[6] *See United States v. St. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013) (citing 42 U.S.C. § 1320a-7b(b)(1)(A)). To prove a conspiracy, the government must show the defendant knowingly and voluntarily entered into an agreement with another person to pursue an unlawful objective and

---

[5] Ricard does not challenge that the statute applies to the conduct with which she is charged.

[6] Specifically, the statute provides:

> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

> . . .

> shall be guilty of a felony.

42 U.S.C. § 1320a-7b(b)(1)(A).

9

committed an overt act in furtherance thereof.[7]  *See United States v. Gibson*, 875 F.3d 179, 187–88 (5th Cir. 2017) (quoting *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013)).

Ricard argues that the government failed to prove that she acted willfully—in other words, that she knew the payments were unlawful. Willfulness in the Medicare kickback statute "means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (quoting *United States v. Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985)).   Under this definition of willfulness, "knowledge that the conduct is unlawful is all that is required."[8]  *Bryan v. United States*, 524 U.S. 184, 196 (1998).

The evidence here supports a finding of willfulness.  We keep in mind that the evidence must be treated in favor of the verdict.  The jury could infer from Ricard's suspicious conduct, misrepresentations, and method of compensation that she knew her conduct was unlawful.  The jury could also conclude that Ricard shuffled psychiatric patients among home health agencies, based on a desire for profit rather than their medical needs.  *Cf. United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017) (inferring fraudulent

---

[7] The conspiracy statute Ricard was convicted under states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.

[8] In contrast, a heightened willfulness standard applies in certain tax and currency structuring cases.  Those statutes "carve out an exception to the traditional rule that ignorance of the law is no excuse and require that the defendant have knowledge of the law." *Bryan*, 524 U.S. at 195 (internal quotation marks and footnotes omitted).

intent when defendant saw patients cycled between services without regard to medical need).  She misrepresented her monthly income in a loan application and, during the entirety of her employment at Progressive did not file income tax returns.  And Ricard was Progressive's highest paid employee, earning more than the agency's medical providers.  *See id.* (defendants' "substantial profits from the scheme" supported jury's finding of fraudulent intent).

Ricard argues that she is not a medical professional or an owner of a health care agency and therefore was not required to sign any documentation acknowledging awareness of the Medicare kickback statute, nor did she receive training on Medicare rules and regulations.  We, however, have never required that an employee be a health care professional or own a health care agency to willfully violate the Medicare kickback statute.  In *Njoku*, we upheld the conviction of a recruiter for conspiracy to pay and receive kickbacks for patient referrals.  737 at 65–66.  And in *Sanjar*, we found there was sufficient evidence that an office administrator willfully paid kickbacks, or conspired to do so, because she "meticulously monitored patient referrals, tracking patients, their referrers, and the billings on their claims."  876 F.3d at 747.

Ricard is correct that our previous Medicare kickback statute cases addressing willfulness have more often dealt with medical professionals or health care company owners.  *See id.* 733–35 (doctors, health care company owners, office administrator, and physician assistant); *United States v. Gibson*, 875 F.3d at 184 (health care company owner); *United States v. Nowlin*, 640 F. App'x 337, 339 (5th Cir. 2016) (health care company owner).  These opinions, however, did not primarily rest on the requirement that medical professionals and health care company owners comply with Medicare rules and regulations in finding that the defendants acted willfully.  In *Sanjar*, we found that the health care company and group-home owners acted willfully because they tracked and monitored patient referrals, received referral fees equivalent to

ten percent of the Medicare claims, the group-home owners required payments for referrals, the conspirators cut out a recruiter from the scheme to increase profits, and the payments were made in cash. 876 F.3d at 747. *Sanjar* did not refer to the requirement that medical professionals and health care company owners must be aware of Medicare rules and regulations when finding that the defendants acted willfully. Similarly, in *Gibson*, we referred to the defendant's "position of authority," but did not discuss his signing of the Medicare enrollment documents. 875 F.3d at 188. In *Nowlin*, we did reference this requirement. 640 F. App'x at 344 ("Nowlin personally signed the . . . enrollment applications agreeing to comply with all relevant regulations."). But, in finding that the defendant acted willfully, we also relied on evidence that commissions for referring Medicare beneficiaries were paid monthly in cash at the defendant's home, the recruiters worked only in the field soliciting beneficiaries, and the recruiter did not keep an office or sign a sales contract. *See id.* Ricard's role as a marketer, rather than a medical professional or health care company owner, does not preclude a finding that she acted willfully.

Ricard further argues that the evidence tends to show that she believed her payment structure was both lawful and the industry norm. A psychiatric nurse at Progressive, who pleaded guilty to receiving an illegal kickback, testified that when she, the nurse, was arrested she was unclear that receiving referral compensation was wrong. Diaz, who owned Progressive and also pled guilty to the scheme, testified that he learned at seminars that marketers could be paid per patient referral. And Ricard characterizes testimony that she was "a little shocked" that Abide would not pay her per patient referral as showing she believed such payments were standard practice in the home health care industry. A rational juror, however, could temper this evidence with Ricard's cycling of patients, concealment of her income, and disproportionate profits.

No. 18-30047

Thus, we hold that the evidence supports Ricard's convictions on the kickback and conspiracy counts.

### B.

We turn now to Ricard's conviction under the identity theft statute.  18 U.S.C. § 1028(a)(7).  A person violates § 1028(a)(7) if he or she (1) "knowingly transfers, possesses, or uses," (2) "without lawful authority," (3) "a means of identification of another person," (4) "with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." *Id.*  Ricard challenges the sufficiency of the evidence as to the first and fourth elements.

When Ricard moved for a judgment of acquittal, she did not specifically reference her identity theft counts.  Instead she only argued that there was "no evidence that [she] knew that receiving money for patient referrals was wrong."  This argument constituted a challenge to the sufficiency of the evidence as to the fourth element—whether her unlawful use of another's identification was in connection with another violation of federal law.  Ricard has thus waived all other arguments. *See United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007).  We therefore review her challenge to the fourth element de novo and her challenge to the first element under the manifest miscarriage of justice standard. *Id.*  Under that heightened standard, "a claim of evidentiary insufficiency will be rejected unless 'the record is devoid of evidence pointing to guilt' or if the evidence is 'so tenuous that a conviction is shocking.'" *Id.* (quoting *United States v. Avants*, 367 F.3d 433, 449 (5th Cir. 2004)).

We begin with § 1028(a)(7)'s first element: whether Ricard "knowingly transfer[red], possesse[d], or use[d]" a means of identification of another person.  Ricard's identity theft conviction was premised on her possession and

transfer of the HIC numbers of three Progressive patients, T.M., S.M., and B.H., in connection with her violation of the Medicare kickback statute; that is, the government contends that Ricard gained unlawful possession of the HIC numbers of these Seaside patients in order to transfer the information to Progressive for its purposes of billing the Medicare program.  Ricard argues, however, that the evidence was insufficient to find that she ever transferred, possessed, or used the HIC numbers of T.M., S.M., or B.H.  We cannot agree.  Although there was no direct evidence presented at trial that Ricard possessed or transferred the HIC numbers of these patients to Progressive, there was sufficient circumstantial evidence from which the jury could reasonably make this inference.  Testimony was introduced that, to bill Medicare, a home health agency must provide to Medicare a patient's HIC number.  T.M., S.M., and B.H.'s patient files, which contained the referral forms with their HIC numbers, were also introduced as evidence.  A Progressive nurse, who treated T.M., testified that if she needed information about a patient she could contact Ricard, who had access to their history, evaluation, and other information.  As we have noted above, absent an objection below, our review of Ricard's challenge to this element is under the highly deferential manifest miscarriage of justice standard.  The jury could infer that Ricard's access to patient information included their HIC numbers.  Because the record is not devoid of evidence pointing to guilt nor is the evidence so tenuous that a conviction is shocking, we reject Ricard's challenge to the first element.

Now the fourth element: whether Ricard's use, possession, or transfer of the identifications was done with "the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law."  18 U.S.C. § 1028(a)(7).  Ricard contends that the evidence was insufficient for the jury to find that her use of the HIC numbers was done with the intent to commit a violation of the Medicare kickback statute.  Ricard,

No. 18-30047

however, merely reasserts her argument that she did not willfully violate the kickback statute. Because we have already determined that the evidence was sufficient to sustain Ricard's kickback convictions, this argument fails. We therefore affirm Ricard's identity theft convictions.

C.

We now come to Ricard's conviction for making a false statement to the OIG–HHS in violation of 18 U.S.C. § 1001. The indictment alleged that Ricard "falsely stated that Progressive did not pay her, on a per patient basis, for referring patients to Progressive." To sustain a conviction under § 1001, the government must prove that Ricard "(1) made a statement (2) that was false (3) and material (4) knowingly and willfully and (5) that falls within agency jurisdiction."[9] *United States v. Jara-Favela*, 686 F.3d 289, 301 (5th Cir. 2012) (citing *United States v. Hoover*, 467 F.3d 496, 499 (5th Cir. 2006)). Ricard contends that the evidence was insufficient to satisfy the first and fourth elements.

Ricard moved for a judgment of acquittal on the false statement count, arguing that there was no physical evidence that she made a false statement to the agents. Thus, she has preserved her challenge to the first element—

---

[9] In relevant part, the statute reads:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

. . .

(2) makes any materially false, fictitious, or fraudulent statement or representation;

. . .

shall be fined under this title [or] imprisoned not more than 5 years.

18 U.S.C. § 1001.

15

whether she "made a statement"—and our review of that element is de novo. *See Eghobor*, 812 F.3d at 362. Ricard did not preserve her challenge to the statute's mens rea element and we therefore review that challenge under the manifest miscarriage of justice standard. *See Phillips*, 477 F.3d at 219.

The government's proof that Ricard made a statement rested entirely on the testimony of the agent who interviewed her. Agent Reel testified that he asked her "if she was paid per patient at Progressive" and that she denied it twice, responding that "there's no way she was paid per patient referral at Progressive." Ricard contends that this evidence was insufficient. The interview was not recorded or transcribed. The only record made of the meeting was Agent Reel's report, prepared at a later but uncertain date.

Ricard must acknowledge that there is no per se requirement that the making of a false statement be corroborated. *See United States v. Sorich*, 523 F.3d 702, 717 (7th Cir. 2008); *United States v. Fern*, 696 F.2d 1269, 1275 (11th Cir. 1983); *United States v. Poutre*, 646 F.2d 685, 688 (1st Cir. 1980); *Marzani v. United States*, 168 F.2d 133, 141 (D.C. Cir.), *aff'd by an equally divided court*, 335 U.S. 895 (1948). But a lack of corroboration is of some concern for two reasons. First, the broad scope and lack of safeguards provided by the statute.[10] And, second, the effect that a lack of corroboration has on the ability

---

[10] The false statements statute applies to both oral and written statements, sworn and unsworn. The statute lacks the protection of common law perjury's two-witness rule; falsity can be proven by the testimony of a single witness. *See Stein v. United States*, 363 F.2d 587, 589 (5th Cir. 1966); *Gevinson v. United States*, 358 F.2d 761, 766 (5th Cir. 1966). The false statement need not actually mislead, or actually influence in any way, a government agency. *See United States v. Abrahem*, 678 F.3d 370, 375 (5th Cir. 2012) (holding a false statement is material if it is "of a type that one would normally predict would influence the given decision-making body"). A defendant can be convicted for simply denying an accusation of guilt by answering "no." *Brogan v. United States*, 522 U.S. 398, 406–08 (1998). And its scope includes not only all matters within the jurisdiction of the three branches of the federal government but, oftentimes, extends to matters before state and local agencies. *See United States v. Taylor*, 582 F.3d 558, 563 (5th Cir. 2009) (affirming false statement conviction based on statement made to a state agency charged with administering a federal program). Yet there is no requirement that the individual be informed that making a false statement is a criminal

of the defendant to defend herself against the accusation of lying. *See Poutre*, 646 F.2d at 688 (stating that "what is actually said by a defendant [is] a critically important part of any prosecution under § 1001"). For instance, two of the few available defenses to a false statement charge are that the defendant was responding to a fundamentally ambiguous question or that her answer was literally true. *See Bronston v. United States*, 409 U.S. 352 (1973) (holding that the perjury statute does not apply to literally true but unresponsive answers); *see also, e.g.*, *United States v. Manapat*, 928 F.2d 1097, 1099–1102 (11th Cir. 1991) (holding that evidence is insufficient in a perjury case "[w]hen the question that led to the allegedly false response is fundamentally ambiguous"). Both of those defenses hinge heavily on the specific words spoken by the defendant and the questioner. *See United States v. Clifford*, 426 F.Supp. 696, 701 (E.D.N.Y. 1976) ("The absence of a verbatim record of the interview raises serious difficulties in light of the Supreme Court's decision in *Bronston*."); *United States v. Ehrlichman*, 379 F.Supp. 291, 292 (D.D.C. 1974) ("[T]he absence of a transcript would make application of [the *Bronston* literal-truth] test nearly impossible.").

In any event, Ricard did not raise either of these defenses below; instead, she only argued to the jury that it should not believe Agent Reel's testimony without audio or video proof. The jury was entitled to determine the credibility of Agent Reel's testimony, weighing the lack of corroboration and the uncertainty of when he drafted his report of the interview. We may only reject that credibility determination in rare circumstances not present here. *See United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014). Thus, on the

---

offense. *See United States v. Yermian*, 468 U.S. 63, 73–74 (1984). Breathtaking, to be sure, in its broad and unsuspecting applications.

facts before us, Ricard's challenge to the first element of the false statement charge, that she did not make a statement, fails.

We move next to Ricard's challenge to the fourth element; that is, whether she knowingly and willfully made a false statement. Ricard makes two points. First, invoking her previous argument, she contends that there was no supporting evidence of what she was specifically asked, and if Agent Reel had asked her if she was paid a "kickback" she would have truthfully answered no, unaware of the definition of that technical term. Second, she argues that because of the two-year gap between her employment at Progressive and the interview, during which time she was employed at other home health care agencies, she could not recall her financial arrangement with Progressive.

Reviewing Ricard's contentions under the extremely limited manifest miscarriage of justice standard, these arguments do not prevail. Agent Reel testified that he asked Ricard whether she was paid by referral before he asked her the more technical question relating to kickbacks. And, according to Agent Reel's testimony, Ricard did not respond that she could not recall her payment structure at Progressive; instead, she affirmatively denied she was paid per referral. We thus affirm Ricard's conviction for making false statements and turn toward a different topic.

IV.

With respect to Ricard's challenge to the evidentiary ruling, the government introduced evidence that, after Ricard left Progressive, she engaged in a similar kickback scheme while employed by Abide. Ricard objected, but the district court ruled that this evidence was admissible under Federal Rule of Evidence 404(b) because Ricard's "participation in a scheme similar to the one charged could demonstrate [her] modus operandi and inform

18

the jury's conclusion as to whether [she] had knowledge of the charged acts and their unlawfulness."[11]

Ricard has properly preserved her objection to this evidence and we review the district court's ruling for abuse of discretion. *See United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015). When evidence is admitted under Rule 404(b), "the abuse-of-discretion standard is 'heightened' . . . because 'evidence in criminal trials must be strictly relevant to the particular offense charged.'" *United States v. Kinchen*, 729 F.3d 466, 470 (5th Cir. 2013) (bracket omitted) (quoting *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003)). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* at 470–71 (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)). Evidence erroneously admitted under Rule 404(b) is subject to a harmless error inquiry and, therefore, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *United States v. Sumlin*, 489 F.3d 683, 688 (5th Cir. 2007) (alteration in original) (quoting Fed. R. Crim. P. 52(a)).

Under Rule 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But bad act evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We apply a two-step test for admissibility which "requires a determination that (1) 'the extrinsic offense

---

[11] The government also argued below that the evidence was admissible because it was intrinsic to the charged crimes. The district court rejected that argument and, because we affirm the district court's Rule 404(b) ruling, we will not address the government's argument on appeal that the evidence was intrinsic.

evidence is relevant to an issue other than the defendant's character' and (2) the evidence 'possess[es] probative value that is not substantially outweighed by its undue prejudice . . . and meet[s] the other requirements of [Federal Rule of Evidence] 403.'" *United States v. Juarez*, 866 F.3d 622, 627 (5th Cir. 2017) (alterations in original) (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)).

Ricard argues that the district court erroneously concluded that the evidence related to the uncharged Abide scheme was evidence of modus operandi, knowledge, or intent. She also argues that the probative value was not substantially outweighed by its prejudicial effect. Ricard contends that Crinel's testimony was unduly prejudicial because it allowed in irrelevant testimony regarding Ricard's work ethic and professionalism while she was employed at Abide. Specifically, testimony that she, unlike the other marketers, would come into the office "like she just rolled out of bed" and had difficulty articulating her thoughts. She also points to testimony concerning Haynes's referral of patients to Abide so that she could be paid. Ricard claims that admitting this evidence permitted the introduction of specific bad acts by Haynes, such as his threatening phone calls, which the jury would connect to Ricard. Ricard argues that the evidence had no probative value because her compensation structure with Abide differed from her compensation at Progressive. At Abide, Ricard was paid a salary for referring six patients per month, with a bonus for exceeding that quota, while at Progressive she was allegedly paid per patient referral.

As to the first prong, the evidence was clearly admissible under our precedent for the purpose of demonstrating intent.[12]  *See United States v.*

---

[12] We disagree with the district court that the evidence was admissible to show modus operandi. Evidence of modus operandi is admissible to prove identity "only if the circumstances of the extraneous act were so similar to the offense in question that they evince

*Peterson*, 244 F.3d 385, 392–93 (5th Cir. 2001) (holding admissible "evidence of similar subsequent conduct (relatively closely linked in time), and evidence of his intent on that subsequent occasion, to draw inferences about the *intent* underlying his conduct").  As to the second prong, to determine whether the probative value of Ricard's uncharged kickback scheme at Abide was substantially outweighed by its undue prejudice, we look to four factors: "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *United States v. Smith*, 804 F.3d 724, 736 (5th Cir. 2015) (quoting *United States v. Kinchen*, 729 F.3d 466, 473 (5th Cir. 2013)).  We also consider whether the uncharged bad act is "of a heinous nature" that would "incite[] the jury to irrational decision by its force on human emotion." *Id.* (quoting *Beechum*, 582 F.2d at 917).  Here, there was a justifiable need for the extrinsic evidence of the Abide scheme because Ricard's intent—whether she acted knowingly and willfully—was the central issue at trial. *Id.*  The schemes were also similar; at both agencies she referred only patients from Seaside, had an unusual working arrangement, and would threaten, through Haynes, to discharge patients if not paid more per referral. The substantive difference between the charged and uncharged schemes was in the manner of her compensation; at Progressive she was paid per referral whereas at Abide she received a bonus for making more than six referrals. Only four months elapsed between the schemes, and, in fact, the Progressive scheme morphed into the Abide scheme.  Ricard transferred her patients and

---

a signature quality—marking the extraneous act as 'the handiwork of the accused.'" *United States v. Sanchez*, 988 F.2d 1384, 1393 (5th Cir. 1993) (quoting *Beechum*, 582 F.2d at 912 n.15).  Identity, however, was never at issue in this case; there could be no dispute that Ricard was the person receiving kickbacks at Abide.  Additionally, there is no indication that the jury considered the evidence for an improper purpose.  The jury charge focused on intent, not modus operandi.

began her scheme at Abide because Progressive refused to pay her more in referral fees. Furthermore, the district court also gave a limiting instruction both during Crinel's testimony and as part of its charge to the jury. Finally, the evidence relating to the Abide scheme lacks the "hallmarks of highly prejudicial evidence" that could lead the jury to an irrational decision. *United States v. Hernandez-Guevara*, 162 F.3d 863, 872 (5th Cir. 1998). It did not involve violent acts, was similar in magnitude to the charged crimes, and did not occupy a disproportionate amount of the jury's time. *Id.* Thus, the district court did not abuse its discretion in admitting into evidence the Abide scheme under Rule 404(b).

## V.

Ricard's final challenge to her conviction is the inclusion of a deliberate ignorance instruction in the jury charge. We review the decision to issue a deliberate ignorance instruction for abuse of discretion. *See United States v. Miller*, 588 F.3d 897, 905 (5th Cir. 2009) (citing *United States v. Orji-Nwosu*, 549 F.3d 1005, 1008 (5th Cir. 2008)). Ricard objected to the deliberate ignorance instruction,[13] arguing that it was "covered by" the instruction concerning "inferring [the] required mental state"[14] and that only one or the

---

[13] The deliberate ignorance charge read:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

*See* Pattern Crim. Jury Instr. 5th Cir. § 1.37A (2015).

[14] The "inferring required mental state" charge read:

> Ordinarily, there is no way that a defendant's state of mind can be proved directly, because no one can read another person's mind and tell what that person is thinking.

22

other charge should be given.  The district court overruled the objection, saying that "while they both deal with the mental element" the deliberate ignorance instruction "is a different charge."

On appeal, Ricard argues that the elements required to give a deliberate ignorance instruction were not met.  Because her argument on appeal differs from her objection below—that the deliberate ignorance charge was duplicative—our review is for plain error.  *See United States v. Fuchs*, 467 F.3d 889, 901 (5th Cir. 2006); *see also United States v. Heath*, 970 F.2d 1397, 1407 (5th Cir. 1992) ("A party may not state one ground when objecting to an instruction and attempt to rely on a different ground for the objection on appeal.").  Under the plain error standard, we have discretion to reverse a forfeited error only if "there is (1) error, (2) that is plain, and (3) that affects substantial rights."  *United States v. Martinez-Rodriguez*, 821 F.3d 659, 662 (5th Cir. 2016) (internal quotation marks and citation omitted).  Even if these three elements are met, we may only exercise this discretion if "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* at 663 (internal quotation marks and citation omitted).  Furthermore, even if a deliberate ignorance charge is error, it is harmless "where substantial evidence of actual knowledge exists."  *United States v.*

---

But a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind.

You may also consider the natural and probable results of any acts that the defendant knowingly did or did not do, and whether it is reasonable to conclude that the defendant intended those results. This, of course, is all for you to decide.

*See* Pattern Crim. Jury Inst. 6th Cir. § 2.08 (2013 ed.).

No. 18-30047

*Boutte*, 13 F.3d 855, 859 (5th Cir. 1994) (citing *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993)).

A deliberate ignorance instruction serves to "inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Wofford*, 560 F.3d 341, 352 (5th Cir. 2009) (quoting *United States v. Wells*, 262 F.3d 455, 465 (5th Cir. 2001)). It guards against a defendant who "choos[es] to remain ignorant so he can plead lack of positive knowledge in the event he should be caught." *Id.* (quoting *United States v. Lara-Valesquez*, 919 F.2d 946, 951 (5th Cir. 1990)). The danger of such an instruction, however, is that, when a defendant must have acted knowingly or willfully, "the jury might convict for negligence or stupidity." *Id.* Thus, a deliberate ignorance instruction "should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance." *Id.* An inference of deliberate ignorance exists if there is evidence showing "(1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *Id.* (quoting *Wells*, 262 F.3d at 465).

There is no dispute that Ricard claimed a lack of guilty knowledge; her central defense at trial, and the main focus of this appeal, is that she did not know that receiving payments for patient referrals, as she did, was itself unlawful. *See id.* at 353 (holding that a deliberate ignorance instruction was proper when defendant argued he was not aware his conduct was illegal); *see also United States v. Wisenbaker*, 14 F.3d 1022, 1027 (5th Cir. 1994) (holding a deliberate ignorance instruction was proper in a tax evasion case when the core defense was lack of a willful mental state).

Thus, we turn to the two-prong test, asking first if there was sufficient evidence showing that Ricard had a subjective awareness of a high probability that the referral payments were unlawful. The evidence showed that Ricard

24

shifted patients, unrelated to the welfare of those patients, to and from different home health agencies, and did so in pursuit of greater personal profits; such transfers are sufficient to infer her subjective awareness of a high probability that her referral payments were legally improper. *See Sanjar*, 876 F.3d at 742.

Next, as to the second prong, we ask whether the evidence "raises the inference that the defendant purposefully contrived to avoid learning of the illegal conduct." *Wofford*, 560 F.3d at 353–54 (citing *Lara-Velasquez*, 919 F.2d at 953). The government points to two items of evidence as demonstrating Ricard purposefully contrived to avoid learning of the illegality of the referral payments. First, when she went to work for Abide, Crinel, Abide's owner, refused to pay Ricard on a referral basis; yet Ricard, despite being apparently "shocked" by this decision, did not ask for an explanation of why the referral arrangement was inappropriate. Second, while employed at Abide, Ricard did not attend orientation, meetings, and trainings held for other marketers; she continued to consider her sole task to only be procuring referrals on her own terms.

We are skeptical that either of these items of evidence raise the inference that Ricard purposefully contrived to avoid learning of the illegality of her conduct. Both acts occurred months after the charged scheme at Progressive was completed. Any error, however, was not plain. *See Fuchs*, 467 F.3d at 901 ("A plain error is one [that] is clear under current law." (internal quotation marks omitted) (alteration in original) (quoting *United States v. Palmer*, 456 F.3d 484, 491 (5th Cir. 2006))). There is no clearly established law in this circuit that the conduct which raises an inference of purposeful contrivance must occur during commission of the charged offenses, rather than during a subsequent, similar scheme. Therefore, we reject Ricard's challenge to the inclusion of a deliberate ignorance jury instruction.

No. 18-30047

VI.

We now consider Ricard's objection to her sentence.

A.

Ricard was sentenced to a fifty-one-month term of imprisonment, which was at the lowest end of her guideline range. Her guideline range was calculated using U.S.S.G. § 2B4.1(b)(1), which states that "[i]f the greater of the value of the bribe or improper benefit to be conferred . . . exceeded $6,500" the offense level is "increase[d] by the number of levels from the table in § 2B1.1."[15] The final PSR determined that the improper benefit conferred was $1.958 million, which exceeded the amount she received in kickbacks. Thus, the PSR used the $1.958 million figure to calculate her specific offense level, resulting in a sixteen-level increase. At sentencing, Ricard objected to this number. She argued that, as a matter of fairness, the improper benefit conferred should be identical to the amount the government agreed to in Diaz's plea agreement: $249,000. She also contended that there was no evidence presented at trial that Progressive was not providing legitimate treatment to its patients.[16]

On appeal, Ricard argues that the improper benefit conferred was improperly calculated because it equaled the total amount paid by Medicare to Progressive, rather than the net value earned by Progressive. In other words, Ricard argues that the district court erred by failing to subtract the cost incurred by Progressive in treating patients from the total amount paid by

---

[15] The commentary defines "value of the improper benefit to be conferred" as "the value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1 cmt. n.2. Ricard does not dispute that Medicare's payments to Progressive were "the action to be taken or effected in return" for her kickback payments.

[16] Ricard also argued, in the alternative, that the improper benefit amount should equal the income she earned at Progressive: $331,000. That argument is not relevant to this appeal.

Medicare.   The government contends that this argument differs from her objection below, limiting our review to plain error.  *See United States v. Garcia-Perez*, 779 F.3d 278, 281 (5th Cir. 2015), *overruled on other grounds by United States v. Reyes-Contreras*, 910 F.3d 169 (5th Cir. 2018) (en banc).  We disagree. Ricard objected to the PSR's calculation of the improper benefit conferred based on Progressive's provision of legitimate treatment to its patients.  This objection "'gave the district court the opportunity to address' the gravamen of the argument presented on appeal."  *Id.* at 281–82 (quoting *United States v. Ocana*, 204 F.3d 585, 588–89 (5th Cir. 2000)).  Our review is therefore de novo. *Id.* at 282.

In *United States v. Landers*, we interpreted the meaning of "value of the improper benefit conferred" used in § 2B4.1 and held that direct costs must be deducted from the gross value to determine a net value.  68 F.3d 882, 884–85 (5th Cir. 1995).  The government argues that *Landers* is inapplicable for two reasons.

We first turn to the government's argument that *Landers* does not apply in cases where a transaction is unlawful on its face.  The government argues that the transactions—Medicare's payments to Progressive—were facially unlawful because Medicare will not pay for services procured through kickbacks.  The government relies on the Third Circuit's decision in *United States v. Pena*, which held that "the concept of netting out costs to arrive at profit is inappropriate under the Guidelines section when the transactions are entirely illegitimate."   268 F.3d 215, 219 (3d Cir. 2001).   That case is inapplicable.  *Pena* dealt with a police officer who accepted bribes in return for permitting illegal poker video gambling machines to operate without police interference.  *Id.* at 217.  As the Third Circuit noted, "the illegal gambling operations involved no legitimate object or service of value" and "therefore there was no other value to 'net out.'"  *Id.* at 220.  In contrast, the underlying

activity here—home health care—is not inherently illegitimate or criminal; it is a service "where something of legitimate value was provided to an individual." *Id.*

But the government argues, in any event, that Ricard did not carry her burden to demonstrate which costs were deductible. We think that the government is a bit off track. It is the government that bears the ultimate burden of proving the facts supporting a sentencing enhancement. *See United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008). At most, Ricard's burden was "to establish that [Progressive] incurred any direct costs." *Landers*, 68 F.3d at 885. We think that Ricard has satisfied her basic burden to proffer evidence that Progressive's services were legitimate. At sentencing, Ricard offered testimony from trial to show patients were receiving legitimate treatment from Progressive. Thus, the district court erred by not deducting Progressive's direct costs—the value of the treatment Progressive provided— in calculating the improper benefit conferred. We therefore vacate Ricard's sentence and remand for recalculation of her Sentencing Guidelines range and resentencing not inconsistent with this opinion.[17]

B.

Lastly, we turn to the restitution order. The victim of Ricard's offenses was Medicare. Ricard objected to the restitution order at sentencing, arguing that Progressive provided legitimate treatment, Medicare had failed to return a Declaration of Victims Losses Affidavit, and there was no evidence on the record of Medicare's true loss amount. The district court rejected these arguments and, relying on Medicare billing data presented at trial, ordered

---

[17] Citing a report to Congress on home health agency margins, Ricard argues that the net benefit to Progressive was $323,070. We leave it for the district court to determine the value of the improper benefit conferred and whether that amount is greater than the value of the kickbacks Ricard received.

No. 18-30047

Ricard to pay $1.958 million to Medicare in restitution pursuant to the Mandatory Victim Restitution Act (MVRA). 18 U.S.C. § 3663A.

Ricard argues on appeal that we should vacate the restitution order because Progressive rendered legitimate medical services and she is entitled to credit for those services. Because Ricard challenges the legality of the restitution order, and objected on similar grounds below, our review is de novo. *See United States v. Adams*, 363 F.3d 363, 365 (5th Cir. 2004).

Restitution under the MVRA is limited "to the *actual loss* directly and proximately caused by the defendant's offense of conviction." *United States v. Mahmood*, 820 F.3d 177, 196 (5th Cir. 2016) (quoting *United States v. Echols*, 574 F. App'x 350, 359 (5th Cir. 2014)). We have previously explained that, "in health-care fraud cases, an insurer's actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud." *United States v. Sharma*, 703 F.3d 318, 324 (5th Cir. 2012). In other words, a defendant is entitled to have Medicare's actual loss amount offset by the the value of services provided to the patients. *See Mahmood*, 820 F.3d at 195.

The burden to demonstrate "the amount of the loss sustained by a victim" is on the government. 18 U.S.C. § 3664(e). The MVRA, however, approves burden shifting based on which party is "best able to satisfy those burdens and who [has] the strongest particular incentive to litigate the particular issues involved."[18] *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998). In *Sharma*, we explained that "at least a portion of the burden . . . to establish [an] entitlement to a restitution credit" should be transferred to the defendant

---

[18] The statute places the burden on the defendant to demonstrate his "financial resources" and "financial needs." 18 U.S.C. § 3664(e). The burden of demonstrating other matters falls "upon the party designated by the court as justice requires." *Id.*

in Medicare cases where the defendant claims that legitimate medical services were provided. 703 F.3d at 325–26. The defendant therefore has a burden to show entitlement to an offset against the amount of actual loss. *See United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019). The defendant meets this burden by establishing "(1) 'that the services [he provided to Medicare beneficiaries] were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud.'" *Id.* (alteration in original) (quoting *Mahmood*, 820 F.3d at 194). If the defendant satisfies this burden, "the government can rebut with additional evidence." *Id.*

Here, the government met its initial burden by pointing to Medicare billing data and Medicare's rule that it does not pay for services procured through kickbacks. *See id.* at 521 (holding that the government established actual loss by "proffer[ing] evidence that Medicare would not have paid the claims of the sixteen patients had it known that Mathew had compromised their identities"). Thus, the burden therefore shifts back to Ricard to establish, using *Mahmood*'s two-factor test, that she is entitled to an offset.

We think that the evidence established that Ricard is entitled to an offset against the actual loss amount. As to the first factor, Ricard pointed to trial testimony suggesting Progressive provided actual treatment to its patients.[19] The government did not present any evidence at sentencing that the treatment was illusory or medically unnecessary to rebut Ricard's evidence. The government now argues that it was not "undisputed" below that Progressive was providing legitimate medical services reimbursable by Medicare. Agent Reel testified at trial that he considered it a "red flag" that the volume of

---

[19] For instance, the government itself elicited testimony from Hopkins that none of Ricard's patients complained about the care they received or asked to be discharged from Progressive.

patients shared between Progressive and Seaside was high, since Progressive's homebound patients presumably could not travel to Seaside's outpatient center for treatment. But the government did not point to this evidence at any point in the sentencing. Instead, the government relied solely on the Medicare billing data that showed the total amount paid to Progressive. Additionally, even if the government had pointed to this "red flag" testimony at sentencing, it amounts only to speculation that the services provided were illegitimate. There is no factual evidence, such as testimony from patients or medical personnel at Progressive, or even from the government, which suggests that Progressive was not providing the medical services it billed to Medicare. *Cf. id.* at 522 (holding that the government rebutted defendant's evidence that the services were legitimate by "methodically proffer[ing] evidence for each of the fifteen patients at issue that undercut Mathew's contentions and supports the opposite").

As to the second factor, there is no suggestion from the record but that Medicare would have paid for Progressive's services except for the kickback scheme. Nor is there any evidence that Progressive's services did not meet Medicare's basic standards of care. The government's only rebuttal argument is that Medicare does not pay for services of patients procured through kickbacks. But "Medicare's conditions of payment that require[] compliance with 'Medicare laws, regulations and program instructions that apply to the provider'" are "not the type of treatment standard[s] that render[] health care services illegitimate." *Mahmood*, 820 F.3d at 195 n.12 (citing *United States v. Jones*, 664 F.3d 966 (5th Cir. 2011)).

Thus, based on the record evidence, Ricard is entitled to a credit to her restitution order equivalent to the full amount that Medicare reimbursed Progressive for its services; and to the point here—after offsetting the amount that Medicare would have paid had there been no kickback scheme, Medicare's

No. 18-30047

actual loss is zero.[20] *See Mahmood*, 820 F.3d at 196; *see also United States v. Liss*, 265 F.3d 1220 (11th Cir. 2001).  The district court erred by ordering Ricard to pay restitution in any amount.  We therefore reverse, and vacate, the district court's restitution order, and remand the same for dismissal.

VII.

In sum, we AFFIRM Ricard's convictions *in toto* for: conspiracy to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371, receipt of health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), unlawful possession, transfer, or use of a means of identification, in violation of 18 U.S.C. § 1028(a)(7), and making false statements, in violation of 18 U.S.C. § 1001.

As relates to her sentence, however, the district court committed error in calculating the improper benefit conferred under U.S.S.G. § 2B4.1 by failing to deduct the value of the services Progressive rendered from the total amount Progressive received from Medicare.  We therefore VACATE Ricard's sentence and REMAND for resentencing not inconsistent with this opinion.

The district court also committed error in ordering restitution when it failed to offset the amount Medicare would have reimbursed Progressive for the services rendered had there been no illegal kickback scheme.  We therefore REVERSE and VACATE the district court's restitution order and REMAND for dismissal.

Accordingly, the convictions are AFFIRMED.  The sentence is VACATED and REMANDED for resentencing.  The restitution order is REVERSED, VACATED, and REMANDED for dismissal.

---

[20] The question of whether the amount of restitution could be related to the amount paid in kickbacks is not presented in this appeal and, consequently, we do not address it.

32