# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 24, 2022

Lyle W. Cayce
Clerk

No. 21-30194

United States of America,

*Plaintiff—Appellee*,

*versus*

Robert Earl Tucker, Jr.,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:20-CR-43-1

---

Before Willett, Engelhardt, and Wilson, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

We withdraw our prior opinion, 33 F.4th 739, and issue the following substitute opinion.

Robert Earl Tucker, Jr., was found guilty of three counts of making false statements to a federally licensed firearms dealer in violation of 18 U.S.C. § 922(a)(6) and two counts of possession in violation of 18 U.S.C. § 922(g)(4). Tucker's pro se appeal raises a host of issues, but we need only

address one: whether his convictions were supported by sufficient evidence. They were not. We therefore REVERSE Tucker's convictions and VACATE his sentence.

I

First the facts. Over a decade ago, Tucker was involuntarily transported to the emergency room under an order for protective custody issued by local law enforcement. A doctor at the hospital concluded that Tucker presented a danger to himself and others. So the doctor issued a physician emergency certificate that authorized Tucker's involuntarily hospitalization for up to 15 days.

Tucker again found himself in hot water two weeks after release. At the request of Tucker's mother,[1] the Morehouse Parish coroner issued a new order for protective custody so that yet another doctor could "determine if [Tucker] should be voluntarily admitted, admitted by emergency certificate, admitted as a non-contested admission, or discharged." Another emergency room doctor determined that Tucker was "in need of immediate psychiatric treatment" because he posed a danger to himself and others. That doctor issued a new physician emergency certificate, and Tucker was again hospitalized. During this 13-day period of treatment, Tucker was diagnosed with paranoid schizophrenia and prescribed medications.

Fast forward to 2019. Tucker bought a pistol from a firearms dealer in Baton Rouge. How? Well, Tucker stated on the ATF form that he had

---

[1] Tucker's mother, with whom he lived, reported that he (1) was recently released from involuntary hospitalization, (2) had "become angry," (3) would "rant[] about stuff," (4) "wrecked his vehicle but refuses to tell what happened or can't remember," and (5) "refuses meds or help."

neither "been adjudicated as a mental defective" nor "committed to a mental institution." Tucker received his firearm several days later.

Not too long afterward, law enforcement detained Tucker—unrelated to his previous purchase—after someone identified him as a suspect in an active-shooter investigation at a Walmart. Police discovered that Tucker possessed a loaded firearm and an extra magazine.

ATF joined the ensuing interrogation. At one point, Tucker reported that he had been hospitalized and held for a 72-hour observation after his mother called the police because of an argument about marijuana use. Tucker later admitted, during another interview, that he lied about the length of his prior hospitalization out of concern that he might lose his right to carry a firearm. It is unclear what, if anything, came of these interviews.

A year later, Tucker tried to purchase another firearm and again noted that he had never been adjudicated as a "mental defective" or committed to a mental institution. An ATF agent then served Tucker at his home with a warning that he was prohibited from possessing firearms or ammunition. The agent explained that this was because Tucker had been "admitted into a mental institution for a lengthy period of time." Later that day, Tucker called the agent to ask (1) whether he could rent guns to shoot at a range, and (2) whether he could purchase a firearm if he stated that he had been adjudicated as a mental defective. The agent answered "no" to both questions.

Three days later, Tucker reached out to the ATF agent to share that he was "buying a weapon this week" and that he "hope[d] to see [the agent] soon." The agent again told Tucker that he was prohibited from purchasing or possessing a firearm. Tucker disagreed. "I am not prohibited from purchasing or possessing a firearm," he texted the officer. Undeterred, Tucker then went to purchase a handgun and again represented on the ATF form that he had never been adjudicated as a mental defective or committed.

No. 21-30194

Law enforcement obtained a warrant for Tucker's home and seized a variety of ammunition. Tucker was arrested and later indicted for three counts of false statements to a federally licensed firearms dealer (for thrice representing "that he had not been adjudicated as a mental defective") in violation of § 922(a)(6) and two counts of possession (one for the firearm seized from him at Walmart and another for the ammunition seized at his home) in violation of § 922(g)(4).

## II

Tucker represents himself on appeal (as he did for most of trial) and raises a panoply of issues. Again, we need only tackle one: sufficiency of the evidence. We hold that the district court reversibly erred because no rational trier of fact could have found the essential elements beyond a reasonable doubt.

Tucker timely raised this issue before the district court, which means our review is de novo—though we remain ever mindful of "the shortcomings inherent in examining a 'cold appellate record.'"[2] Critically, however, no reasonable degree of deference could overcome the fact that Tucker never underwent an "adjudication" in the sense contemplated by § 922(g)(4). Black's Law Dictionary explains that "adjudicate" commonly means "[t]o rule on *judicially*."[3] Other courts across the country have similarly embraced

---

[2] *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020) (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014)); *see also United States v. Tinghui Xie*, 942 F.3d 228, 234 (5th Cir. 2019) (describing deferential nature of our review).

[3] *Adjudicate*, Black's Law Dictionary 52 (11th ed. 2019) (emphasis added); *accord* Webster's New Collegiate Dictionary 56 (9th ed. 1987) (defining "adjudicate" as "to settle judicially"); *see also, e.g.*, Webster's New International Dictionary 33 (2d ed. 1939) (defining "adjudicate" as "[t]o hear or try and determine, as a court" or "to settle by judicial decree"); Benjamin W. Pope, *Legal Definitions* (1919–1920) (defining

No. 21-30194

this common understanding.[4] Yet the record lacks anything that resembles, let alone aspires to, judicial process. This is no trivial detail.

The United States insists that the physician emergency certificate process constituted an adjudication, leaning heavily on the regulatory indication that "adjudicated" includes a "determination by . . . [a] lawful authority."[5] But even were we to venture beyond the statute's plain language, a potpourri of interpretive canons—the constitutional-doubt canon and the rule of lenity, to name just two—would betray the United States' desired reading. Courts interpreting the ATF's regulatory definition have concluded similarly.[6] Thankfully, the plain text of the statute relieves us of the need to precariously balance the Second Amendment on ex parte, often-unreviewable opinions of medical professionals. We leave the constitutionality of that framework for another day.[7]

---

"adjudication" as "[a]n application of the law to the facts and an authoritative declaration of result").

[4] *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) ("Congress did not prohibit gun possession by those who were or are mentally ill and dangerous[] . . . . Congress sought to piggyback on determinations made in prior judicial proceedings . . . ."); *United States v. Vertz*, 40 F. App'x 69, 75 (6th Cir. 2002) ("Congress specifically required an 'adjudication' when a mental defect is the disabling circumstance . . . ."); *Wilborn v. Barr*, 401 F. Supp. 3d 501, 510 (E.D. Pa. 2019) ("[A] plain reading of the term 'adjudication' provides the 'involvement of a judicial-decision maker, the resolution of a dispute after consideration of argument by the parties involved, and a deliberative proceeding with some form of due process.'" (citation omitted)).

[5] *See generally* 27 C.F.R. § 478.11.

[6] *See, e.g.*, *Franklin v. Sessions*, 291 F. Supp. 3d 705, 716 (W.D. Pa. 2017) (applying the principle of noscitur a sociis, concluding "other lawful authority" must resemble the specific, introductory categories of a "court, board, [or] commission").

[7] We also reserve comment on whether the United States' broad conception of "a mental defective" is correct. *See, e.g.*, *United States v. Hansel*, 474 F.2d 1120, 1125 (8th Cir. 1973) ("If it is the desire of Congress to prohibit persons who have any history of mental illness from possessing guns, it can pass legislation to that effect, but we cannot read into

5

No. 21-30194

III

To be clear, our holding affects not only Tucker's convictions for possession but also those for false statements. We therefore REVERSE Tucker's convictions and VACATE his sentence.

---

this criminal statute an intent to do so."). The phrase as to have long carried a particular meaning, which speaks not to generalized mental illnesses but instead to an archaic class of intellectual disability. *See, e.g.*, *id.* at 1124–25 (accumulating various sources that pre-date the passage of the Gun Control Act in 1968); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 687 (6th Cir. 2016) (en banc) ("[W]e note that § 922(g)(4) does not use the phrase 'mentally ill,' nor does it attempt to prohibit all currently mentally ill persons from firearm possession. Rather, the statute uses prior judicial adjudications—incompetency and involuntary commitment—as proxies for mental illness."); *see also, e.g.*, *United States v. B.H.*, 466 F. Supp. 2d 1139, 1147 (N.D. Iowa 2006) (holding that the appellant was not "adjudged as a mental defective" because he was never found to lack a normal degree of intellectual capacity, as is the common understanding in both psychology and the law); *cf. also, e.g.*, *Townsend v. Sain*, 372 U.S. 293, 303 (1963) ("An expert witness called by the prosecution testified that Townsend had such a low intelligence that he was a near mental defective . . . ."); *Culombe v. Connecticut*, 367 U.S. 568, 620 (1961) ("The man . . . was a thirty-three-year-old mental defective . . . with an intelligence quotient of sixty-four and a mental age of nine to nine and a half years."); *United States ex rel. Johnson v. Shaughnessy*, 336 U.S. 806, 808 (1949) (discussing Section 3 of the Immigration Act of 1917, which excluded from admission to the United States those found "mentally defective"). *See generally* Helene Burgess, *The Mental Defective and the Law*, 23 Intramural L. Rev. N.Y.U. 115, 116 (1967) (noting "mental defective" refers to "those testing in the underaverage group who[] . . . could never perform at the level of average intelligence" or "who are so severely and recognizably behind the norm as to warrant special . . . help"); Philip L. Harriman, *Handbook of Psychological Terms* 98 (1963) (defining "mental defective" as "an idiot, imbecile, or moron; one who cannot adjust to the community by reason of low intelligence"); John D. Comrie, Black's Medical Dictionary 590 (H. A. Clegg ed., 18th ed. 1944) (defining "mental defectiveness" as "a primary condition in which certain persons never develop to the average standard of intelligence"); *cf. generally* American Pocket Medical Dictionary 585 (W. A. Newman Dorland ed., 17th rev. ed. 1943) (defining "moron" as "[a] *mental defective* whose mental age is between eight and twelve years" (emphasis added)).