# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2023

Lyle W. Cayce
Clerk

No. 22-40519

———

United States of America,

*Plaintiff—Appellee*,

*versus*

Laura Jordan, Mark Jordan

*Defendants—Appellants*.

———

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:18-CR-87-1

———

ON PETITION FOR REHEARING EN BANC

Before Higginbotham, Graves, and Douglas, *Circuit Judges*.
Per Curiam:[*]

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 35 I.O.P.), the petition for panel rehearing is DENIED. Because no member of the panel or judge in regular active service requested that the court be polled on rehearing en banc (Fed. R. App. P. 35 and 5th Cir. R. 35), the petition for rehearing en banc is DENIED. The

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-40519

opinion issued August 25, 2023, is withdrawn by the panel and the following is substituted in its place.

The appellants, a Texas developer and a former mayor of Richardson, Texas, appeal their convictions for bribery and tax fraud, asserting that the bribes were merely gratuities and the district court failed to properly instruct the jury. For the reasons stated herein, we AFFIRM in part and VACATE in part.

## FACTS AND PROCEDURAL HISTORY

Laura Maczka (Laura) was elected to the Richardson, Texas city council in 2011. She was elected mayor of Richardson in 2013 after running largely on the platform of not allowing any new apartments near neighborhoods. Laura's term as mayor began on May 20, 2013.

Mark Jordan (Mark) is a commercial real estate developer with ownership interests in various business entities including, but not limited to, Sooner National Property Management, JP Realty Partners/JP-Richardson, LLC, and JP-PAL IV MM, LLC. In 2011, JP Partners purchased 43 acres of land and two office towers, known as the Palisades, on the west side of Interstate 75 in Richardson. The property adjoined the Prairie Creek neighborhood, which is where Laura lived with her husband and children. At the time of purchase, the Palisades was zoned for retail use, office use, 121 townhomes and 300 condominiums.

On November 5, 2013, Mark requested a zoning change before the City Planning Commission that would allow the construction of 750 apartment units on the property. On November 19, Mark amended the request to allow for 600 apartments. The commission unanimously recommended that the zoning plan be approved by the city council.

No. 22-40519

Residents opposed to the rezoning began organizing and started a petition drive. On December 2, 2013, the Prairie Creek homeowners' association issued a statement that it did not support the proposal.

Meanwhile, behind the scenes in the months prior to that, Laura and Mark were secretly meeting, exchanging personal emails and calls, and working together to obtain the rezoning. Laura and Mark were documented on email chains for the Palisades project as far back as May 9, 2013, the same month that Laura was elected mayor. In October of 2013, Laura and Mark also set up a meeting to discuss the development project with another city councilmember, Steve Mitchell, who had endorsed Laura for her campaign promise not to support the development of apartments in or adjacent to neighborhoods.

On November 21, 2013, prior to the city council's first vote, Laura forwarded Mark an email with the subject "CCHA Update: Palisades Statement to City Planning Commission" from her personal email account and said: "FYI . . . And FTR, good thing I had such a fun afternoon yesterday. Because last night the prairie creek mob hit me hard! You were probably enjoying barbecue and chillaxing. I was taking bullets for you! :-)" Later that day, Laura and Mark made plans to meet at one of his buildings and go to the mall.

Around that same time, Mark's wife, Karen, discovered the emails between Laura and Mark, who had a history of infidelity. When Karen confronted Mark, he said nothing was going on and he was only flirting with the mayor to get what he wanted. Laura's husband, Mike, and Mark's former paramour, Sarah Norris (Norris), who was also his business partner in Sooner National Property Management, also began to suspect that Mark and Laura were having an affair. When Mike confronted Laura, she denied anything other than a friendship.

No. 22-40519

On December 9, 2013, the city council held a hearing on the Palisades rezoning. A large number of residents who opposed the rezoning were in attendance. The measure passed by a vote of five, including Laura, in favor and two opposed. But the city also requested that the matter be brought back with a plan for phasing the construction, leaving the vote with no legal effect.

In January of 2014, Norris hired a private investigator to follow Mark. The investigator obtained photos and video of Mark and Laura walking arm-in-arm out of a restaurant and going to a Holiday Inn Express. After Mike later found the hotel invoice in his car, Laura admitted she was having an affair but claimed it was with someone other than Mark. In mid-January, Laura told her husband she was going to Salt Lake City, Utah for a mayor's convention. She was actually meeting Mark at a $3400 per night ski resort. About ten days later, Mark signed a contract for the option to purchase an additional 20 acres of Palisades land if it was rezoned to allow for additional apartments. Mark then asked the city to approve a rezoning plan to allow for 1,400 apartments on the property. On January 27, 2014, the city council held a second vote on the rezoning and approved it by the same vote of five to two, with Laura again voting in support.

Around the middle of April, Laura took a city business trip to San Jose, California. Once the official business concluded, Laura stayed behind to meet up with Mark, who was also in California on business, for a few nights at luxury hotels at his expense. After Laura returned home from California, Mike found additional evidence of the affair and Laura said she wanted a divorce.

Meanwhile, Norris discovered numerous purchases by Mark on the company credit card for restaurants, resorts, limousines, a burner phone, and a charge for him upgrading Laura to first class for their return trip from California. Mark told Norris he was just using Laura to get approval for his

4

rezoning plan. Mark later admitted to Karen that he and Laura had a relationship. But he insisted that they had only kissed, claiming he was not physically attracted to Laura.

The city council scheduled the third vote on Mark's plan regarding the proposal to add 1,400 new apartments. Numerous residents showed up to voice opposition to the proposal, and the number of apartments was reduced to 1,090. But on June 9, 2014 the rezoning passed again with Laura's support yielding another five to two vote.

In August 2014, Mark sent a letter to the city on behalf of his partnership seeking reimbursement for the construction of public infrastructure for the Palisades. Mark estimated that the value of the Palisades would be $686,300,000 by 2024. Shortly thereafter, Laura opened a bank account in her own name and with herself as sole signatory. A series of transactions followed wherein Mark would withdraw money and Laura would deposit money. As one example, on September 9, Mark withdrew $1,000 from his bank account and Laura deposited $300 in her account. Two days later, Laura deposited $1,000 in her account while on a birthday trip with friends to Florida. Laura also abruptly left her friends to go stay with Mark in Rosemary Beach, Florida at his expense.

Shortly thereafter, on September 22, 2014, the city council voted unanimously to authorize negotiations with Mark and his business partners to reimburse them for various construction and infrastructure expenses connected to the Palisades. Over the next several months, Mark worked with city staff, including Laura, to reach an agreement. During that time, Mark also continued to provide financial benefits to Laura, including multiple cash payments, a $40,000 check, home renovations after Laura's husband moved out of the family home, various trips, luxury hotel stays, etc. Mark had the $24,030.02 in home renovations done by one of his contractors, and had it

billed as "carpet stock" for one of his own buildings, MacArthur Plaza. He also asked the contractor to "keep it on the down low." When Karen confronted Mark about why he was doing the remodeling work on Laura's home, he replied: "Because, Karen, we owe her. We owe her a lot. She's made us a lot of money."

Laura and Mike divorced in January 2015. Mark also filed for divorce from Karen on January 15, 2015. Laura filed to run for a second term as mayor the following month. Around that same time, Mark hired Laura as a leasing agent at Sooner National Property Management for $150,000 per year with a signing bonus of $15,000. Laura had no real estate experience and was not a licensed agent. The person who had previously held the position had left because the position only paid $70,000 per year. The media attention generated by Laura's involvement with the developer behind the Palisades resulted in an ethics investigation by the city. However, neither Laura nor Mark disclosed the sexual relationship, cash payments, luxury hotel stays, various trips, home renovations or the $40,000 check. Thus, the investigator found no wrongdoing, and the city entered into an agreement to reimburse Mark some $47 million for construction and infrastructure work. Laura voted in favor of the agreement to pay Mark the $47 million on September 22, 2014. In fact, in December of 2014, Laura was still denying to members of the city council that she and Mark were having an affair. Laura claimed that her parents paid for her house to be remodeled.

Around April or May of 2015, the FBI received a tip about the transfer of money, trips and other items of value between Laura and Mark and began an investigation. On May 18, 2015, Laura announced that she was declining another term as mayor for the 2015-17 term.

In July of 2015, Mark had lunch with Norris, who no longer worked with him. She was wearing a wire for the FBI. Mark said he had hired a

retired federal judge as his criminal defense attorney. He also said that the attorney had advised him to get engaged to Laura, but Mark denied to Norris that he would ever marry Laura. After Mark found out that the FBI was aware of him paying for Laura's home renovations, he started telling people that he and Laura were getting married and that he loved her. Norris also recorded a meeting with Mark in October 2016 wherein Mark again denied that he would marry Laura.

Mark and Karen finalized their divorce on August 16, 2016. On May 30, 2017, the district court held a hearing as part of the grand jury's investigation of the bribery case. The following day, Laura told her friend, a reverend, that she and Mark wanted to get married right away rather than wait to have a family event in July 2017. Mark and Laura obtained their marriage license the very next day, June 2, and were married three days later on June 5, less than a week after the hearing. Laura also told another friend, "[o]ur lawyers have told us we have to get married, and hopefully we'll marry some day because we choose to."

Mark and Laura were indicted in 2018 on the following seven counts: Four counts of honest services wire fraud and conspiracy in violation of 18 U.S.C. §§ 1343, 1346, 1349; one count of conspiracy to commit bribery concerning a program receiving federal funds in violation of 18 U.S.C. § 371; one count of bribery concerning a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B); and one count of bribery concerning a program receiving federal funds in violation of 18 U.S.C. § 666(a)(2).

Following a nearly month-long jury trial in early 2019, Mark and Laura were convicted on all but one count, Count 2, of honest services wire fraud. After the district court was informed of a conversation a court security officer had with a distraught juror, the district court granted the defendants' motion for a new trial. The government appealed because the district court did not

hold a hearing before granting a new trial, and a panel of this court affirmed. *See United States v. Jordan*, 958 F.3d 331, 338 (5th Cir. 2020).

On December 9, 2020, the grand jury returned a superseding indictment that included the original counts but also added five additional charges, as follows: one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371; two counts of willfully aiding and assisting in the preparation and presentation of materially false tax returns in violation of 26 U.S.C. § 7206(2); and two counts of willfully aiding and assisting in the preparation and presentation of materially false tax returns in violation of 26 U.S.C. § 7206(2).

Following the second trial, which was held July 2 to July 23, 2021, the jury found Mark and Laura not guilty on counts 1 and 4 (honest services wire fraud and conspiracy) but found them guilty of the bribery and conspiracy charges, and the tax and conspiracy charges. Laura was found guilty on counts 5, 6, 8, 9 and 10 of the superseding indictment. Mark was found guilty on counts 5, 7, 8, 11 and 12.

Mark and Laura filed various post-trial motions and asked the district court to postpone sentencing until this court decided *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022). The district court denied all of the motions. The district court also concluded that, even if this court were to determine, as it ultimately did in *Hamilton*, that § 666 did not extend to gratuities, the convictions would stand because it found beyond a reasonable doubt that the jury verdict would have been the same even if the jury had been instructed that a quid pro quo was required.

The total statutory maximum sentence for each defendant totaled 312 months. The district court granted a downward variance of 240 months and sentenced each defendant to a total of 72 months of imprisonment. Specifically, Laura received 60 months on count 5, 72 months on count 6, 60

months on count 8, 36 months on count 9, and 36 months on count 10, all to run concurrently. Mark received 60 months on count 5, 72 months on count 7, 60 months on count 8, 36 months on count 11, and 36 months on count 12, all to run concurrently. Each defendant was also ordered to pay a fine of $100,000 to the United States, a special assessment of $500, and they were jointly and severally liable for restitution of $34,275. Each defendant also received 3 years of supervised release on each count, to run concurrently. Thereafter, Mark and Laura appealed.

## STANDARD OF REVIEW

This court reviews a district court's denial of a motion for judgment of acquittal de novo. *United States v. Garcia-Gonzalez*, 714 F.3d 306, 313 (5th Cir. 2013). This court must "affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (internal marks and citation omitted).[1] This court's "review of the sufficiency of the evidence is highly deferential to the verdict." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (internal marks and citation omitted). The standard of review is the same for both direct and circumstantial evidence. *Id.*

---

[1] Mark concedes the application of this standard but asks that this court reconsider "to allow for a judgment of acquittal to be entered when the evidence is in equipoise, which was the rule in this circuit before it was rejected by the full court in *Vargas-Ocampo* in 2014." Mark argues that *Vargas-Ocampo* makes this circuit an outlier, and that the majority of other circuits apply the equipoise rule because "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt." He cites *Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014), and *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010), as authority. However, the evidence here is not equipoise, and the en banc court has already spoken in *Vargas-Ocampo*.

No. 22-40519

This court typically reviews jury instructions for an abuse of discretion. *See United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013). However, "when, as here, a jury instruction hinges on a question of statutory construction, this court's review is de novo." *Id.* (internal marks and citation omitted). This court has said that a failure to instruct a jury on every essential element is error. *See United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016). Erroneous jury instructions are subject to a harmless error standard.[2] *See United States v. Skilling*, 638 F.3d 480, 482 (5th Cir. 2011); *see also Neder v. United States*, 527 U.S. 1, 18-19 (1999). "Erroneous jury instructions are harmless if a court, after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Stanford*, 823 F.3d at 828 (internal marks and citation omitted). This court has also said that "we construe the evidence and make inferences in the light most favorable to the defendant." *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir. 2009).

This court reviews a sentencing challenge under a deferential abuse-of-discretion standard regardless of whether the sentence is inside or outside the Guidelines range. *See Gall v. United States*, 552 U.S. 38, 51 (2007). We "must first ensure that the district court committed no significant procedural error," and then "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51; *see also United States v. Hudgens*, 4 F.4th 352, 357-58 (5th Cir. 2021). Additionally, "[t]his court reviews the district court's interpretation and application of the Guidelines de novo and its factual findings for clear error." *United States v. Castelo-Palma*, 30 F.4th 284, 286 (5th Cir. 2022).

---

[2] Though conceding its application, Mark also objects to the harmless error standard, arguing that some other circuits require more.

No. 22-40519

## DISCUSSION

### I. Bribery convictions

#### A. Quid pro quo evidence

Mark asserts that his convictions for the bribery counts should be reversed or, at a minimum, vacated and remanded for a new trial because there was insufficient evidence of a quid pro quo and because the district court failed to properly instruct the jury. Mark cites *Hamilton*, 46 F.4th at 398, for the proposition that a quid pro quo is an element of a § 666 violation. Mark says that there was insufficient evidence, as summarized by the district court, and the convictions on the bribery counts must be reversed.

Mark argues that the "heart" of the prosecution's case for a quid pro quo was Laura's change of mind on the Palisades. Further, he says that Laura voting in an inconsistent manner is not evidence of a quid pro quo. Mark also asserts that the "lead FBI case agent testified at trial that there was no evidence [Laura] received a bribe prior to the first vote."[3] Mark says the emails between he and Laura also are not evidence of a quid pro quo. Additionally, Mark says the fact that the affair happened in the same timeframe as the votes does not support an inference that there must have been a quid pro quo agreement. He quotes *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018), as follows: "A close temporal relationship between political contributions and favorable official action, without more, is not sufficient to prove the existence of an explicit quid pro quo." Mark asserts that this is particularly so because, after the first vote, the subsequent

---

[3] Mark is quoting part of an exchange during cross examination while ignoring the rest of the agent's testimony and other evidence in this case. Also, Laura's counsel acknowledged at sentencing that Laura received "time, attention and affection" prior to the first vote. The Guidelines specifically say that "payment" means "anything of value" and "need not be monetary." U.S.S.G. § 2C1.1 cmt. n. 1.

11

votes were a "foregone conclusion." Notwithstanding the fact that *Menendez* is a lower court case from New Jersey and not controlling authority, it does not apply because "without more" was not the case here.

Mark argues that the payments he made to Laura were made after the final vote and, thus, were mere gratuities in reward for votes because Laura had made him a lot of money. Notably, Mark did not reward any of the other "yes" votes. Mark also says the facts that he and Laura hid their relationship, repeatedly lied, destroyed documents and emails, and got married on the advice of counsel after the FBI launched its investigation had nothing to do with a quid pro quo, "as opposed to a gratuity, a conflict of interest, or even a perfectly lawful but embarrassing affair." Mark also explicitly admits that he paid for votes, saying: "There was insufficient evidence of a quid pro quo bribery agreement, rather than, at worst, *the payment of gratuities as a reward for votes*, to allow a jury to find a quid pro quo beyond a reasonable doubt." (Emphasis added).

Laura asserts that she presented substantial evidence that no quid pro quo agreement existed, and the jury may have wrongly convicted her of receiving a "reward" without a quid pro quo. She also asserts that only the first vote mattered, the affair did not begin until after the first vote, and the money, home improvements, trips, luxury hotel stays, job, etc., were all just mere gratuities. Laura also explicitly admits payment for votes. But Laura maintains that, as a city official rather than a federal official, she was free to accept "rewards" or "gratuities" on federally funded projects under § 666(a)(1) and *Hamilton*. Laura argues that all four votes she made for Mark's Palisades project would have passed anyway without her vote. The problem with that argument is that Laura met with other city council members ahead of the first vote to try to get them on board. Additionally, the record reflects that Laura and Mark had planned for her to vote against him on one of the votes in an attempt to avoid the possible appearance of a conflict

of interest.  But prior to that vote, they realized they needed her vote and ditched the plan.  Laura also adopts Mark's briefing on this and other issues and instead focuses on jury instructions.

The government asserts that there was sufficient evidence of a quid pro quo.  Further, the government points to the district court's conclusion that this is a bribery case and "[f]rom the outset, the government centered its theory of prosecution on quid pro quo bribery" and the defense "sought to hold the government to proving a quid pro quo beyond a reasonable doubt."   The government further relies on the fact that the jury was repeatedly told during voir dire and the trial that the government had to prove a quid pro quo.

The district court filed its Memorandum Opinion and Order on August 3, 2022.  The order disposed of multiple motions, including the defendants' motions to dismiss and for a new trial.

Mark focuses on three pages of the order to argue that there was insufficient evidence of a quid pro quo.  However, neither the record nor the order support his assertions.  The record establishes that Mark and Laura were involved long before the first vote, that Laura was "taking bullets" for Mark over the project before the first vote, and that Mark told multiple people he was merely using Laura to get what he wanted.  The record also indicates that multiple people, including but not necessarily limited to Norris, Karen, and the contractor who worked on Laura's house, warned Mark about his inappropriate involvement with the mayor to get his zoning passed and his attempts to cover it up.  Mark also told Karen that he owed Laura (money, renovations, etc.) because she made them a lot of money.

The record reflects evidence of ongoing communications between Mark and Laura long before the first vote that clearly indicate they were working together to get the project approved.   Laura even had Mark

answering questions from her constituents, and they found great humor in some of his responses.  They were also secretly meeting and spending time alone together prior to the first vote, despite claiming that the affair did not start until after the first vote.[4]  Also, the first vote basically had no effect because the city requested that it be brought back with a plan.  The argument that only the first vote counted lacks merit.[5]  Further, once the first request was approved, Mark kept asking for more.  He bought additional land, sought approval of more apartments, requested reimbursements, and used his influence over Laura to advance his pecuniary interest.  Clearly, the first vote was not the only one that mattered.

Moreover, even *Hamilton* did not go so far as to say that payments are not bribes as long as you make them after an initial vote.  Instead, in *Hamilton*, this court adopted the First Circuit's interpretation of § 666 that "reward" is included "to prevent a situation where a thing of value is not given until *after* an action is taken."  46 F.4th at 397 (citing *United States v. Fernandez*, 722 F.3d 1, 23 (2013) (emphasis original)).  In *Fernandez*, the First Circuit said that the term reward serves to clarify "that a bribe can be promised before, but paid after, the official's action."  722 F.3d at 23 (internal marks and citation omitted).

A review of the record in this matter establishes that there was sufficient evidence of a quid pro quo, and that distinguishes this case from *Hamilton*, as discussed more fully below.

---

[4] Mark and Laura do not explain why they were keeping their involvement a secret at that point if they were neither conspiring to get the rezoning approved nor having an affair yet.

[5] Laura dismisses the three votes after the first vote as "*faits accomplish*" or having already been decided.

No. 22-40519

### B. Quid pro quo instruction

This case basically comes down to whether the district court's failure under *Hamilton* to instruct the jury as to quid pro quo is harmless error. In *Hamilton*, a panel of this court decided that 18 U.S.C. § 666 only applies to quid pro quo bribery. 46 F.4th at 397. In doing so, the panel determined that § 666 does not apply to "mere gratuities," vacated Hamilton's convictions and remanded. *Id.* at 398.

Mark asserts, in the alternative, that the bribery convictions should be vacated and remanded for a new trial because the district court failed to instruct the jury on the need to find a quid pro quo agreement as an element of a § 666 offense as required by *Hamilton*, and that the error was not harmless. Mark says that the instructions here were like the instructions in *Hamilton* that this court found insufficient.[6] *See id.* at 398. In other words, Mark says, "the instructions in both cases permitted the jury to convict a defendant for a gratuity or reward without finding a preconceived quid pro quo."

Mark says that, because the district court found that its instructions were in error under *Hamilton*, the only issue before this court is whether the error was harmless. He further says the government acknowledged in its response to post-trial motions that the jury could have reasonably found

_____

[6] In his initial brief, Mark acknowledged that the government had filed a petition for rehearing in *Hamilton* in which it argued that the instructions did require the jury to find a quid pro quo to convict. However, Mark then argued that the district court here did not give the same instructions as *Hamilton*. Thus, he asserted that, even if the rehearing was granted, it would not affect this case. En banc rehearing was denied in *Hamilton* on February 17, 2023, with seven judges voting in favor of rehearing and nine against. *United States v. Hamilton*, 62 F.4th 167 (5th Cir. 2023). Regardless of whether *Hamilton* was correctly decided, there are key distinctions between the two cases, as discussed herein.

either a quid pro quo or a reward.  Mark asserts that the evidence in this case plainly establishes that the jury could have acquitted of a quid pro quo.  He argues that, even if this court finds that the evidence was sufficient, it still must find that the failure to properly instruct the jury was not harmless because the district court's analysis did not draw all inferences in favor of acquittal as required.  Also, Mark asserts that the district court erred in relying on the statements of counsel in opening and closing arguments to conclude that the case was argued as a bribery case and the jury must have found a quid pro quo.[7]

Laura largely argues the same.

The government concedes that the district court committed a *Hamilton* error when instructing the jury on the § 666 charges but asserts that the error was harmless.  The government is correct.  The district court made an explicit finding that it was concluding beyond a reasonable doubt that Mark and Laura would have been convicted even under the correct instruction.  We agree with that finding.

Mark and Laura conceded that the payments were for votes but that under *Hamilton* they were merely "gratuities" or "rewards," and she was not a federal official.

In *Hamilton*, the panel said that "Ruel Hamilton gave money to members of the Dallas City Council. *He received nothing tangible in return*." *Id*. at 391 (emphasis added).  That was because the low-income-housing tax credits Hamilton sought were ultimately not granted by the Texas Department of Housing and Community affairs after the local officials voted to recommend them.  *Id*.  The panel also said, in instructing the jury, "the

---

[7] Mark concedes that the jury was properly instructed that statements of counsel were not evidence and irrelevant to the harmless error determination.

district court (over Hamilton's objections) told the jury that neither a quid-pro-quo exchange nor any 'official act' by the councilmembers was required." *Id.* at 393. The panel said that "it *is* an abuse of discretion 'to apply an erroneous view of the law.'" *Id.* at 394 (quoting *United States v. Ayelotan*, 917 F.3d 394, 400 (5th Cir. 2019)) (emphasis original). The panel then concluded "that § 666 does, in fact, require a quo; a quid alone will not suffice. And the jury instruction that the district court gave did not convey that." *Id.* at 394.

Here, Mark received much in return, as discussed previously herein. While there was not a specific instruction, the jury was told repeatedly that it was a quid pro quo case, and the evidence clearly supported a quid pro quo. The parties agree that the dispositive issue is whether the district court's error was harmless.

As stated previously, "[e]rroneous jury instructions are harmless if a court, after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Stanford*, 823 F.3d at 828 (internal marks and citation omitted). In other words, a reviewing court "asks whether the record contains evidence that could rationally lead to [an acquittal] with respect to the [valid theory of guilt]." *Skilling*, 638 F.3d at 482 (quoting *Neder*, 527 U.S. at 19). Our review of the record leads us to agree with the district court that the jury verdict would have been the same regardless of the error. Laura points to some evidence in the record that she argues makes the question of quid pro quo bribery contested. For example, she asserts that there is evidence that she supported the Palisades development before meeting Mark. But we are not persuaded that this evidence, when viewed against all the other evidence in the voluminous record, would lead a rational jury to acquit even when given the correct quid pro quo instruction. Thus, any error in the district court's failure to explicitly instruct on quid pro quo was harmless.

### C. Motive instruction

The district court instructed the jury, in relevant part, as follows:

> During the trial, evidence was presented regarding the defendants' possible motives for their actions. The fact that an action may have been motivated, in part, by friendship or a romantic interest is no defense. Actions taken with a dual motive constitute bribery so long as one of the motives is to influence or reward a public official, or, in the case of the public official, to be influenced or rewarded. On the other hand, if actions were entirely motivated by legitimate reasons, like romantic interest, then they do not constitute bribery.

Mark asserts that the convictions for the bribery counts should be vacated and remanded for a new trial because the district court's instruction on mixed motive was an error that allowed the jury to convict without finding that his motive was primarily or materially corrupt. He incorporates Laura's arguments in her opening brief in support of the proposition that the instructions improperly allowed the jury to convict even if it did not find that the government proved Mark's motives were not primarily or materially corrupt. Finally, he asserts that the "instructional error merits a new trial on the bribery counts and on the tax conspiracy count that is premised on the bribery counts."

Laura asserts that the jury instructions unconstitutionally shifted the government's burden to her by saying she could be found guilty if at least one of her motives of accepting benefits from Mark was to be influenced or rewarded for official actions and she had the burden of proving the affirmative defense that acceptance of the benefits was entirely motivated by legitimate reasons. Laura says that means that jurors could have interpreted that to mean if only one percent of her motive was corrupt, she was still guilty. Laura also argues that including "or rewarded" in the instruction violated

*Hamilton* because she was free to accept "rewards" for votes.[8]  Laura also cites inapplicable cases for the proposition that there should be a materiality requirement read into 18 U.S.C. § 666(a)(1).  Laura says that would mean a public official's corrupt motive in accepting a bribe would have to be more than incidental or irrelevant at the time she accepted the bribe.  She then cites what she says is an analogous case for the proposition that: "Otherwise, the improper motive would not be significant enough to call into question the integrity of the public official's actions."  *See United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 406-07 (1999).

The government correctly asserts that the minor corrupt motive argument was raised for the first time on appeal, and a materiality objection was not raised at trial.  Thus, it is reviewed for plain error.  With regard to the burden shifting argument, which was raised at trial pertaining to the instruction defining "corruptly," the government asserts that the district court did not abuse its discretion.  *See United States v. Sanjar*, 876 F.3d 725, 740 (5th Cir. 2017).  The government also sets out that the district court did not shift the burden of proof.  We agree.

Notwithstanding our agreement that the district court did not shift the burden of proof, the cases cited by Laura are inapplicable.  For example, in *Sun-Diamond Growers*, the Supreme Court was talking about why 18 U.S.C. § 201(c)(1)(A) does not criminalize token gifts such as a school baseball cap or a replica jersey from a championship team, not large cash payments or anything else of the sort that occurred here.  *See id.*, 526 U.S. 406-07.  Significantly, *Sun-Diamond Growers* also does not support Laura's argument regarding materiality or motive.  Laura acknowledges as much, then asserts

---

[8] As discussed herein, *Hamilton* does not establish that rewards for votes are lawful in every circumstance.

alternatively, "the doctrines of lenity and constitutional-doubt require such an interpretation of the statute," citing *United States v. Tucker*, 47 F.4th 258, 261 (5th Cir. 2022).   But *Tucker*, which involved the sufficiency of the evidence of convictions for making false statements to a federally licensed firearms dealer and possession, is not analogous and provides no authority for Laura's argument here.  *Id.* at 259.  In dicta, this court merely mused as to what canons might come into play should it "venture beyond the statute's plain language."  *Id.* at 261.  Further, there is no "materiality" requirement in § 666(a), and Mark and Laura fail to cite any controlling authority requiring us to insert one now.

This issue has no merit, and the district court did not plainly err or abuse its discretion.

### D. Federal or local funds

Mark asserts that the government failed to establish that the conduct underlying the bribery counts affected federal or local funds as required by § 666.   Thus, Mark says that the application of § 666 to him was unconstitutional and the district court's denial of Mark's motion for entry of a judgment of acquittal should be reversed under *Sabri v. United States*, 541 U.S. 600, 604-06 (2004); *United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000); and *United States v. Spano*, 401 F.3d 837, 841 (7th Cir. 2005).

Finally, Mark asserts that his constitutional challenge was not untimely in reference to what he says was the district court faulting him for not filing a motion to dismiss the superseding indictment on the basis that § 666 cannot be constitutionally applied because it fails to allege that the conduct had an effect on local funds.  Mark cites a nonbinding case from the Northern District of Georgia for the proposition that as-applied constitutional challenges are not appropriately raised in pre-trial motions to dismiss.  Mark then concedes that, if he had filed such a motion, the

government would have argued that the indictment, on its face, alleged an impact on local funds of $47 million.  Further, he says that even if he was required to move on this issue before trial, it was not waived and this court could review his argument for plain error under *United States v. Vasquez*, 899 F.3d 363, 373 (5th Cir. 2018).  Mark says his challenge satisfies plain error because "it raises a clear constitutional concern" and would affect his rights "since it invalidates the convictions on the bribery counts."  Laura joins Mark's argument on this issue.

The government asserts that the district court did not plainly err in rejecting the untimely Article I challenge as a basis for post-trial dismissal or acquittal.  Further, the government points out that precedent forecloses the claim.

Mark and Laura were charged in 2018.  They moved to dismiss other counts prior to their first trial.  They were convicted the first time in 2020.  They moved to dismiss other counts again.  After they were retried and convicted a second time, they argued in post-verdict motions that the bribery counts should be dismissed because the application of § 666 was unconstitutional.  Mark and Laura argued that their conduct involved only a city zoning issue that did not put any federal funding at risk.

The district court found the Article I claim untimely under Rule 12, which provides that such a motion must be made before trial.  *See* Fed. R. Crim. P. 12(b)(3).  The district court also found that Mark and Laura did not show good cause for an exception under Fed. R. Crim. P. 12(c)(3).  Additionally, to the extent that Mark and Laura were not challenging the indictment but rather the sufficiency of the evidence at trial, the district court rejected the argument on the merits.

As the district court correctly found, the elements of § 666 do not require the government to prove that the conduct is traceable to federal funds. Section 666, in relevant part, states:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists--
>
> > (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--
> >
> > . . .
> >
> > (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or
> >
> > (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a).  Section 666 further says:

> (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666(b).

Additionally, none of the cases cited by Mark and Laura establish otherwise.  In *Sabri*, the Supreme Court answered the question of "whether

18 U.S.C. § 666(a)(2), proscribing bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds, is a valid exercise of congressional authority under Article I of the Constitution" by concluding that it is. *Id.*, 541 U.S. at 602. As the Court further explained:

> It is true, just as Sabri says, that not every bribe or kickback offered or paid to agents of governments covered by § 666(b) will be traceably skimmed from specific federal payments, or show up in the guise of a quid pro quo for some dereliction in spending a federal grant. . . . But this possibility portends no enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there. And officials are not any the less threatening to the objects behind federal spending just because they may accept general retainers. . . . It is certainly enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest, such as that provided here.

*Id.* at 605-06 (internal citations omitted). In other words, the Court said that the $10,000 threshold alone satisfies Article I without any requirement that the federal money be directly connected as an element to the offense. *Id.*; *see also United States v. Franco*, 632 F.3d 880, 883 (5th Cir. 2011). While *Sabri* involved a facial challenge, the Court gave clear indications that an as-applied challenge would not have fared any better. *Sabri*, 541 U.S. at 609.

The record and the applicable authority support the district court's findings. This issue has no merit.

No. 22-40519

## II. Tax convictions

### A. Vindictive Prosecution

Mark asserts that the tax counts should be dismissed for vindictive prosecution, or in the alternative, the issue should be remanded to the district court for an evidentiary hearing. Mark says that, because the government added the tax counts only after the district court vacated the convictions in the first trial and ordered a new trial, the timing is sufficient to trigger the presumption of vindictiveness. He cites *United States v. Dvorin*, 817 F.3d 438, 455 (5th Cir. 2016), as authority.

In *Dvorin*, the government added a forfeiture notice in the second superseding indictment. *Id.* at 454. Dvorin argued that the addition was an act of prosecutorial vindictiveness. *Id.* at 455. In reviewing the matter, this court said, "[t]he defendant must prove prosecutorial vindictiveness by a preponderance of the evidence, and may do so either by showing actual animus or showing sufficient facts to give rise to a presumption of vindictiveness." *Id.* (internal marks and citation omitted). In determining whether a "presumption of vindictiveness" applies, "the court examines the prosecutor's actions in the context of the entire proceedings." *Id.* (internal marks and citation omitted). If "the course of events provides no objective indication that would allay a reasonable apprehension by the defendant that the additional charge was vindictive," then a presumption of vindictiveness applies. *Id.* (internal marks and citation omitted). To overcome the presumption, the government must prove "by a preponderance of the evidence that events occurring since the time of the original charge decision altered that initial exercise of the prosecutor's discretion." *Id.* (internal marks and citation omitted). The court concluded that Dvorin had alleged facts sufficient to invoke the presumption and the government had not rebutted the presumption. *See id.*

24

Here, the government asserted that it had planned to bring the tax counts in the original indictment, but the internal DOJ approval process was too slow.  The approval process was apparently restarted when "there was a realistic possibility" the convictions would be overturned.

Mark argues that this does not provide a non-retaliatory explanation for the government's decision.  Mark also argues that the district court erroneously believed he had forfeited the issue by not raising it in a pretrial motion to dismiss.  Mark says that "[a]llowing a presumptively vindictive prosecution to stand would constitute a clear and obvious error that would affect defendants' substantial rights, and therefore satisfies the plain error standard."   (Internal marks and citation omitted).   Thus, he says the convictions on the tax counts must be reversed.  Mark also argues that, at the very least, the court should remand for an evidentiary hearing, citing the nonbinding case of *United States v. Tingle*, 880 F.3d F.3d 850, 856 (7th Cir. 2018).   In doing so, Mark again contradicts himself by claiming the government "offered no explanation for its charging decision" even though he already conceded that the government did offer an explanation that he believed was insufficient.  Regardless, we conclude that Mark is unable to establish a presumption of vindictiveness because the government offered an explanation sufficient to establish an objective event or non-retaliatory basis for adding the tax counts. *See Dvorin*, 817 F.3d at 455; *see also United States v. Saltzman*, 537 F.3d 353, 358-64 (5th Cir. 2008).  Thus, we affirm on this issue.

### B. Insufficient evidence

Mark asserts that there is insufficient evidence that he possessed the heightened level of willfulness needed to support a conviction on the tax counts.  He says that, for him to be found guilty of the tax counts, the jury had to find he had actual knowledge of the pertinent legal duty and violated it. *See Cheek v. United States*, 498 U.S. 192, 200-02 (1991).  Mark argues that

the district court failed to identify the relevant evidence in denying his motion for a judgment of acquittal.

With regard to the tax conspiracy count, Mark argues that the district court failed to identify evidence that he had knowledge of whether Laura reported the benefits he provided her as income on her tax returns. Additionally, Mark argues that, if this court agrees there was insufficient evidence of a quid pro quo, then "there was no evidence Mr. Jordan believed that non-quid pro quo gratuities" are taxable income.

The parties agreed that Laura did not report the benefits she received from Mark as income on her tax returns. However, she asserts that her conviction on these charges is tainted by the same jury instructions that she claims transformed her claimed rewards for votes into illegal bribes. Laura also asserts that she did not report the $52,000 in cash and a check, the $25,030 in home renovations, the travel expenses, and various other payments, including her legal fees from the ethics investigation, from Mark because she considered them all to be gifts. Laura also argues that authority supporting the proposition that even "rewards" become "income" does not apply to her. For example, Laura says that *Dobbe v. Comm'r*, T.C. Memo 2003-330, 2000 WL 1586383 at *11-12 (U.S. Tax Ct. Oct. 25, 2000), involved a gift from an employer to an employee for no other reason than an employment relationship, as opposed to someone having a romantic relationship with their boss, like her. While one of the deductions in *Dobbe* stemmed from a gift of golf clubs to a salesman, others stemmed from payments for personal benefit of the taxpayers, who were married shareholders of their wholly owned corporation. *Id.* Laura then argues that "Mark could have paid benefits to Laura for reasons other than her economic contribution as an employee, namely, because they had an affair or because of her acts as mayor (without a quid pro quo)." Thus, Laura says, the *Hamilton* error also requires reversal of all of the tax counts.

No. 22-40519

As we have previously concluded, any *Hamilton* error was harmless. Additionally, the record provides sufficient evidence of willfulness. This issue has no merit.

### C. Conspiracy

Mark asserts that the tax conspiracy count should be reversed because there is insufficient evidence of an agreement to falsify tax returns to support a conviction. Mark cites one case as general authority, *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1998), then argues, again, that the district court failed to identify the evidence in denying his motion for judgment of acquittal. Mark then discusses the "one paragraph the district court devoted to this issue," but fails to provide a record citation or any other authority. In the alternative, Mark argues that, if the tax conspiracy count is not reversed, it should be remanded for a new trial. Laura likewise argues for reversal.

The government concedes this issue, acknowledging that evidence of the agreement to commit bribery and attempts at concealment was insufficient to support the conspiracy charge under 18 U.S.C. § 371. We agree, and we vacate the convictions and sentences of Mark and Laura on this count.

## III. Sentence

Mark asserts that his sentence should be vacated and remanded for resentencing. He asserts that the sentence was driven entirely by the bribery counts, with no additional offense levels added based on the tax counts. If the bribery counts are reversed, but any of the tax counts are not, he asserts that the sentence on the tax counts should be vacated and remanded for resentencing. However, we affirm on the bribery counts. Mark asserts that, if the bribery counts stand, the errors in application of the Guidelines tainted

the sentencing process and the case should be remanded for resentencing. He says that this resulted in a non-Guidelines sentence being imposed.[9]

The district court adopted the PSR's calculation of an offense level of 42 and a criminal history category of 1, which provided for a Guideline range of 312 months.[10] Mark argues that the district court declined to follow the Guidelines and ordered a non-Guidelines sentence of 72 months. Mark also argues that the correct Guideline range should have been 33 to 41 months for an offense level of 20 and a Criminal History Category I. Additionally, Mark argues that the PSR did not indicate the total value of the payments Mark made to Laura, the total value of anything obtained by Laura or the total benefit received by Mark. He says, instead, that the PSR based the enhancement under the § 2B1.1 table solely on the $42,777,079 he was to receive.

The PSR set out the following:

Between October 6, 2011, and September 4, 2014, Mark Jordan (Mark), a commercial real estate developer, and his limited liability company (LLC) partnerships (JP-Richardson, LLC, and JP-PAL IV MM, LLC) formed multiple Limited Liability Company Agreements (JP-KBS Richardson Holdings, LLC; JP-Richardson Holdings II, LLC; and JP-Palisades IV, LLC) (Company Agreements) with equity investors that led to the purchase of Palisades, an 80-acre proposed mixed-use development within Richardson, Texas. The total Palisades project was purchased for $54,955,000. Through these Agreements, Mark Jordan acted as the managing partner.

---

[9] Mark's counsel agreed at sentencing that a non-Guidelines' sentence was appropriate.

[10] The statutory maximum for a violation of § 666(a)(1) is 120 months.

The PSR said that Mark had a ten percent ownership interest in each of JP-Richardson, LLC and JP-PAL IV MM, LLC.  With regard to JP-Richardson, LLC, the PSR said:

> JP-Richardson, LLC's 10 percent interest was comprised of 20 percent ownership by 2004 Jordan Family Trust, of which Mark was the Trustee, and 80 percent ownership by JP Richardson Investors Joint Venture, of which the 2004 Jordan Family Trust had 62.33 percent ownership.  Therefore, Mark owns 6.233 percent of JP-Richardson.

Mark objected to the PSR's statements regarding his ownership interest in the Palisades development.  Mark's objection was largely centered around the fact that he and Karen eventually divorced, which divided his ownership interest.  The probation officer's response maintained that, at the time Mark committed the criminal conduct, he held a 6.233 percent interest in the Palisades development, and that amount was consistent with trial evidence.

The PSR divided Mark's convictions into two groups pursuant to U.S.S.G. § 3D1.2.  The bribery group, counts five and seven, started with a base offense level of 12 under U.S.S.G. § 2C1.1, and included the following increases: 2 levels under § 2C1.1(b)(1) for multiple bribes; 22 levels under § 2C1.1(b)(2) for an expected benefit of $42,777,079; 4 levels under § 2C1.1(b)(3) for involving an elected public official; and 2 levels under § 3C1.1 for obstruction by deleting emails.  The adjusted offense level for this group was 42.

Specifically, the PSR said: "Based on Mark Jordan's 6.23 percent ownership stake in Palisades and future valuation of Palisades at $686,300,000, as detailed in his Request for Development Incentives submitted to the City of Richardson, his benefit to be received in return for his bribes to Laura Jordan amounts to $42,777,079."

U.S.S.G. § 2C1.1(b)(2) provides that the table in § 2B1.1 applies when the value of the payment or the benefit received exceeds $6,500. For a loss of more than $25 million, the table provides an increase of 22 levels. *See* U.S.S.G. § 2B1.1(b)(1)(L). The commentary to § 2C1.1 states:

> "Loss", for purposes of subsection (b)(2), shall be determined in accordance with Application Note 3 of the Commentary to § 2B1.1 (Theft, Property Destruction, and Fraud). The value of "the benefit received or to be received" means the net value of such benefit. Examples: (A) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the preceding examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe.

U.S.S.G. § 2C1.1 cmt. n. 3.

Mark argues that the votes would have passed without Laura. But they did not pass without Laura or her influence. He also asserts that Laura supported the Palisades project before she met him. However, there is substantial evidence in the record that she did not, and that she campaigned on her opposition to apartments near neighborhoods. Regardless, Mark says any value received would have been received even without the bribes. In support, Mark cites *United States v. Griffin*, 324 F.3d 330, 367 (5th Cir. 2003) which he summarizes as: "[R]eversing sentence based on Guidelines calculation that included salary negotiated before alleged bribe." But Mark fails to establish how that is applicable here.

Mark also argues that the $42,777,079 did not represent the "net value of the benefit" as required under § 2C1.1 cmt. 3, citing *United States v. Ricard*, 922 F.3d 639, 657-58 (5th Cir. 2019), as authority. He asserts that the amount is based on an incorrect assumption that he held a 6.233 percent share of the future value of the Palisades. Instead, he says, "[t]he 6.233% represented the district court's mistaken understanding of Mr. Jordan's share of the vacant undeveloped land."[11] Mark also says that he held different percentage stakes in different parcels to be developed.

*Ricard* was a case involving Medicare kickbacks and a guideline range calculated under U.S.S.G. § 2B4.1(b)(1) for commercial bribery. *Id.*, 922 F.3d at 656-57. U.S.S.G. § 2B4.1(b)(1) states, in relevant part:

> If the greater of the value of the bribe or the improper benefit to be conferred (A) exceeded $2,500 but did not exceed $6,500, increase by 1 level; or (B) exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S.S.G. § 2B4.1(b)(1).

While noting that the commentary to § 2B4.1 cross-references U.S.S.G. § 2C1.1, this court has previously interpreted the meaning of the "value of the improper benefit conferred" and concluded that direct costs, but not indirect costs, should be deducted from the gross value to determine a net value. *See United States v. Landers*, 68 F.3d 882, 884-85 (5th Cir. 1995). This court also concluded that the district court's finding accurately represented the net value because Landers failed to establish any other direct costs to be deducted. *Id.* at 885. This court also concluded that "net value"

---

[11] The record indicates that there were two existing buildings and a parking garage located at the Palisades at the time it was acquired.

does not mean "net profits," and relied on a Third Circuit case for the following: "This concept of 'net value received' has nothing to do with the expense incurred by the wrongdoer in obtaining the net value received. This is clear from the Note's instruction that the value of the bribe is not to be deducted in calculating the 'net value.'" *Id.* (quoting *United States v. Schweitzer*, 5 F.3d 44, 47 (3d Cir. 1993). Further, "[t]he harm caused by a bribe is the value lost to a competing party had the bribe not been paid." *Id.* (citing *United States v. Ford*, 986 F.2d 1423 (6th Cir. 1993)). "That harm is independent of the value of the bribe." *Landers*, 68 F.3d at 885.

Citing *Landers*, this court in *Ricard* concluded that the district court erred by not deducting the direct costs from the value of the treatment provided in calculating the improper benefit conferred. *See Ricard*, 922 F.3d at 658. Importantly, this court did so after concluding that Ricard had "satisfied her basic burden to proffer evidence" showing that patients were receiving legitimate treatment. *Id.* The court also clarified that, while the government has the burden of proving facts in support of a sentencing enhancement, "Ricard's burden was 'to establish that [Progressive] incurred any direct costs.'" *Id.* (quoting *Landers*, 68 F.3d at 885).

Here, Mark did not satisfy his basic burden to establish any direct costs or applicable deductions. *See id.*; *see also Landers*, 68 F.3d at 885. Moreover, the record and the authority support the PSR's calculations, which were confirmed by Mark's own documents and statements recorded at city council meetings. Further, *Griffin* explicitly reiterated that "[t]he district court need not determine the value of the benefit with precision." *Id.*, 324 F.3d at 366.[12] "In fact, in determining the amount of benefit to be

―――――――――――――――――――

[12] Citing *Landers*, 68 F.3d at 884 n.2.

received, courts may consider the expected benefits, not only the actual benefits received." *Id*., 324 F.3d at 366. Thus, there was no error.

Even if there had been error, it would be subject to a harmless error standard. *See United States v. Halverson*, 897 F.3d 645, 651 (5th Cir. 2018). To satisfy harmless error, the government must show that "(1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Id.* (internal marks and citation omitted). The government is easily able to do so here, as the district court explicitly said it would impose the same sentence for the same reasons even if Mark and Laura prevailed on every objection on appeal.

Further, though Mark does not challenge the substantive reasonableness, the sentence was substantively reasonable. *See Hudgens*, 4 F.4th at 358.

## IV.  Evidentiary ruling

Laura asserts that the district court committed reversible error by admitting evidence of a prior marital infidelity for the purpose of proving that she was a liar. The district court found the evidence admissible pursuant to Rules 404(b), 608 and 403 of the Federal Rules of Evidence.

The government agrees with Laura that the evidence was not admissible under Rule 404(b). With regard to whether it was admissible under 608(b), "the government believes that the better end of the argument is that Laura's prior infidelity was not admissible under Rule 608(b)." However, the government also asserts that any error was harmless.

As Laura and the government state, we review a district court's evidentiary rulings under a deferential abuse of discretion standard, subject to a harmless error analysis. *See United States v. Perry*, 35 F.4th 293, 325 (5th Cir. 2022); *see also United States v. Sanders*, 343 F.3d 511, 517 (5th Cir. 2003).

Laura cites *United States v. Stone*, 472 F.2d 909, 916 (5th Cir. 1973), for the proposition that the trial court there properly refused to allow the defendant to seek to impeach a key prosecution witness with her marital infidelity.  She also cites some non-controlling authority for the general proposition that, under Rule 608, a witness' marital infidelity is simply not probative of truthfulness or untruthfulness.  In *Stone*, a Georgia case involving a kidnaping, brutal rape, and maiming, the trial court refused to make an *in camera* inspection of the government's files at the defendant's request so that he could discover whether the government had any evidence regarding the marital infidelity of the victim while her husband was in Vietnam. *Id.*  *Stone* presented a different scenario than we have here, where Laura, neither a prosecution witness nor a victim, claimed she was having an affair and in love, not engaging in bribery or corruption and was cross-examined about it.  But we will presume, without deciding, that the evidence was inadmissible for purposes of determining harmless error.  Under the doctrine of harmless error, the evidentiary ruling will be reversed only if it affected Laura's substantial rights.  *See Adams v. Memorial Hermann*, 973 F.3d 343, 351 (5th Cir. 2020).

Laura asserts that the evidence that she had another extra-marital affair prior to her affair with Mark and lied about it was not harmless because it "invoked a dark image of an immoral woman in search of sex for votes.  It went to the heart of the theory of the defense – that Laura accepted benefits from Mark out of love and affection."

The record does not support Laura's argument.  The record is replete with evidence of Laura's dishonesty and her extramarital affair with Mark.  Additionally, when Laura initially admitted her extramarital affair with Mark to her husband, she lied and said the affair was with someone other than Mark.  Moreover, there was no suggestion that the previous affair was with someone who had matters pending before the city council.  Because Laura is

No. 22-40519

unable to establish that the evidentiary ruling affected her substantial rights, any error was harmless.

## CONCLUSION

For the reasons stated herein, we AFFIRM in part and VACATE in part.